In the Matter of the Application of CHARLES KNOWACK and JOHANNA KNOWACK, Respondents, for the Restoration of their Four Children in Custody of the CHILDREN'S AID SOCIETY of Rochester, N. Y., Appellant.

1. COMMITMENT OF DESTITUTE CHILD NOT A CRIMINAL PROCEEDING. A proceeding under section 291 of the Penal Code, for the commitment of a destitute child to a charitable institution, is not a criminal proceeding.

2. RESTORATION OF COMMITTED CHILD TO PARENT BY CHANCERY. Where a destitute child of intemperate parents has been committed to a charitable institution, under section 291 of the Penal Code, and the parents have reformed and become able to care for the child, the Supreme Court has power, under its general chancery jurisdiction, to intervene, upon a petition of the parents, and restore the child to them during its minority and without the consent of the custodial institution.

3. CHANCERY POWER OF SUPREME COURT AS TO RESTORATION OF CHILD TO PARENT. Where there has been an interference by the court to protect and care for a child at the public expense, the chancery power of the Supreme Court as to the restoration of the child to the care of its parent seems only to be limited by the necessities of the case, having a due regard for the welfare of the infant.

4. DISCHARGE OF CHILDREN FROM CUSTODY, UNDER POOR LAW. Chapter 438 of the Laws of 1884 is still in force as a part of the Poor Law of the state, and discloses a statutory scheme in regard to the committal and subsequent discharge from custody of poor children that is practically in line with the general chancery power of the Supreme Court.

5. Restoration of Committed Child to Parent by Chancery or under Poor Law. The questions controlling the restoration to its parents, of a pauper child in the custody of a charitable institution, whether through the chancery power of the Supreme Court or under the Poor Law, are the same. to wit, the best interests of the child and the ability of the parent, both moral and financial, to discharge his duty in the premises.

*Matter of Knowack*, 29 App. Div. 627, affirmed.

(Argued February 28, 1899; decided April 18, 1899.)

Appeal from an order of the Appellate Division of the Supreme Court in the fourth judicial department, entered December 9, 1898, affirming an order of Special Term awarding the custody and possession of children in the hands of appellant to their parents.

The nature of the proceeding and the facts, so far as material, are stated in the opinion.

*John H. Hopkins* for appellant. Persons committed by the final judgment of a court or magistrate of competent jurisdiction, in a criminal proceeding, cannot be discharged by the Supreme Court by virtue of its general equitable powers. (*Matter of Forbes*, 4 Park. Cr. Rep. 611; L. 1895, ch. 355, § 3; Penal Code, § 291; Code Crim. Pro. § 749; L.1896, ch. 272, § 61; *People ex rel. v. Masten*, 79 Hun, 580; *State v. Ray*, 63 N. H. 406; *People ex rel. v. N. Y. C. Protectory*, 101 N. Y. 195; *People ex rel. v. N. Y. C. Protectory*, 106 N. Y. 604; *People v. Giles*, 152 N. Y. 136.)

*Delbert C. Hebbard* for respondents. The Supreme Court has jurisdiction of all matters pertaining to the care, custody and control of infants. In this proceeding it has jurisdiction to order that the infants be returned to their parents when, in the opinion of that court, it will be for the best interests of said children, and when that court is satisfied that the parents are able, fit and competent persons to have the care, custody and control of said infants. (2 Kent's Com. 21; *Wilcox v. Wilcox*, 14 N. Y. 575; *People ex rel. v. Erbert*, 5 Abb. Pr.

395.) These children have, since the 5th day of June, 1895, been a charge upon the poor fund of the city of Rochester. They come clearly within the definition of poor persons as found in section 2 of the Poor Law, and, as such, have been in the care and custody of the Children's Aid Society. (*People ex rel.* v. *City of Brooklyn*, 152 N. Y. 399.)

Bartlett, J. This is a proceeding based upon a petition addressed to the Supreme Court of the state of New York by Charles Knowack and Johanna, his wife, praying that their four children, now in the custody of the Children's Aid Society of Rochester, be restored to their care and control.

At the time this petition was verified, on the 22d of December, 1897, the four children of the petitioners — the only issue of the marriage — were aged, respectively, Frank, twelve years; Gustave, eleven years; Emil, eight years, and Freddie, six years.

It appears that some two years before the present application was made, and on the fifth day of June, 1895, these children were committed by a police justice of the city of Rochester to the care of the Children's Aid Society, under section 291 of the Penal Code, on the ground of the intemperance and neglect of their parents.

Each child was committed by a separate commitment which was headed "Destitution Commitment," and recited that the child "was found not having any home or other place of abode, or proper guardianship, being in a state of want and suffering, and destitute of means of support, in violation of statute," etc. The child was to remain in charge of the society "until therefrom discharged in manner prescribed by law, not to exceed the period of its minority."

Section 291 of the Penal Code is contained in chapter III, entitled "Abandonment and other acts of cruelty to children."

This section is somewhat lengthy and provides that any child, actually or apparently under the age of sixteen years, who is found, under certain circumstances, may be duly committed.

Subdivision two states " not having any home or other place of abode or proper guardianship ; or who has been abandoned or improperly exposed or neglected, by its parents or other person or persons having it in charge, or being in a state of want or suffering; or (subdivision three) destitute of means of support," etc.

So far as this record discloses the facts, the petitioners do not dispute the regularity of the original commitments, nor does the Children's Aid Society controvert the allegations in the petition and accompanying affidavits.

The petitioners aver that whatever ground might have existed on the fifth day of June, 1895, for the removing of the children from their care and custody, has been fully and absolutely removed; and that since the last-named day they have been sober, industrious, and have tried by all means possible to live honorable and respectable lives.

It further appears that the father and mother are both earning good weekly wages for persons in their position ; that they are in comfortable financial circumstances and have a substantial bank account with the Rochester Savings Bank of the city of Rochester, and own good and valuable chattels and securities; that they are free from all debts and are in comparatively independent circumstances for persons in their station in life.

The petitioners further aver that they are in every way able, willing and desirous of caring for their four children, who are now a charge upon the poor fund of the city of Rochester for their food, clothing and care, and that all the facts touching their willingness, ability and desire are more fully set forth and confirmed by the affidavits attached to the petition.

The petitioners further show that they have made frequent demands of the president and other officers of the Children's Aid Society for the return of their children, and that they even offered that the children be returned to them on trial, to be taken away again without resort to law, whenever the petitioners' conduct might seem to the officers of the society

to justify such proceeding; but the officers have at all times refused to comply with these demands and requests.

It further appears that the children are all anxious and desirous of returning to the home of their parents.

Annexed to the petition are a number of affidavits of third parties corroborating in detail the allegations that the petitioners are sober, industrious and for a long time have been living honorable and respectable lives.

The truth of the allegations of the petition and affidavits is admitted, the Children's Aid Society in substance demurring to these facts.

It is claimed by the learned counsel for the society that persons committed by a final judgment of a court or magistrate of competent jurisdiction in a criminal proceeding cannot be discharged by the Supreme Court in the exercise of its general equitable powers.

Counsel further states that when a child is finally committed to a charitable institution under section 291 of the Penal Code, there is no way by which the institution can be deprived of its custody, except by the consent or in consequence of the misconduct of the institution itself, unless the commitment is directly and successfully attacked by appeal under section 749 of the Code of Criminal Procedure, or by a habeas corpus proceeding.

The main position of the society is based upon an erroneous conception of the situation now presented.

This is not a criminal proceeding; there is no prisoner and no crime has been committed.

We have already called attention to the fact that the section of the Penal Code (291) under which these commitments were made, is contained in the chapter (III) entitled "Abandonment and other acts of cruelty to children."

The state, as *parens patriæ*, by this legislation seeks to protect children who are destitute and abandoned by those whose duty it is to care for and support them.

To regard proceedings under this benign statute as criminal in their nature, and hedged about with all of those conse-

quences that follow a judgment of conviction for crime, is to confound remedies.

The law relating to the commitment of minors to penal and charitable institutions is largely of American origin, and rests upon statutory provisions.

These commitments are naturally relegated into three classes, commitments as a punishment for crime, commitments where the proceeding is *quasi* criminal and commitments for care and guardianship.   (30 Cent. Law J. 53.)

In the first class are cases of actual crime, where the proceeding often results in the commitment of the defendant to a reformatory by reason of his minority, rather than to send him to a penitentiary or state prison, where he would be thrown in contact with hardened criminals.   Notwithstanding this consideration extended to the defendant, he stands in the attitude of a criminal duly convicted of crime.

The second, or *quasi* criminal class, may be illustrated by the case of a parent or guardian who makes application and complaint to a magistrate, asking the commitment of a minor child to some reformatory or charitable institution on the ground that he is incorrigible or beyond domestic control.

The main object of such a proceeding is to reform a child, if possible, and this commitment is governed by different rules than either of the other classes.

The third class, where the state intervenes to care for and protect the homeless and destitute child, is far more numerous and is the one that embraces the case at bar.

The single question presented by this appeal is whether the Supreme Court of the state of New York, having general jurisdiction in law and equity, and being vested with all the jurisdiction which was possessed and exercised by the Court of Chancery in England at the time of our separation from the mother country, except as modified by the Constitution and statutory provisions (Section 217, Code Civil Pro.), has power to intervene in this case and restore these children to the custody and care of their parents.

It certainly is a most startling doctrine that a child, who is

a public charge and has been committed for such reasons as are disclosed in this case, cannot be restored to parental care and control, where conditions have changed and are such that neither in law or morals the separation of parent and child should be continued. We are not now called upon to decide what effect legal adoption in good faith by third parties would have on an application like this.

The Children's Aid Society stands in this proceeding upon the bald proposition of law already stated, that without its consent to their release these children are to remain in the custody of this institution during their minorities.

As the youngest child was only three and a half years of age when thus committed, it would be subjected to legal custody for a period of more than seventeen years.

This record fails to inform us as to the charter provisions of the Children's Aid Society.

Stripped of all form and technicality we have this situation : Intemperate parents are deemed to be unfit custodians of their children, and the state steps in and cares for and supports them for the time being. It now appears that the parents have reformed, are living honorable lives and are abundantly able to care for their children.

It seems self evident that public policy and every consideration of humanity demand the restoration of these children to parental control.

If the Court of Chancery can interfere and take the child from the custody of its parents, it can also intervene and restore it to their care in the exercise of the same discretionary power.

A recent English writer declares that the Court of Chancery has, from time to time, exercised the widest powers of interference in behalf of infants who stood in need of its protection. (Eversley on Domestic Relations [second ed.], 501.)

Chancellor KENT said that " Courts of justice may, in their sound discretion, and when the morals or safety or interests of the children strongly require it, withhold the infants from the

custody of the father or mother and place the care and cus-
tody of them elsewhere." (2 Kent's Com. 205.)

The arbitrary character of this power is well illustrated in
two English cases often cited. Lord THURLOW, in a case where
it appeared that the father's affairs were embarrassed, that he
was an outlaw and resided abroad, and that his son, an infant,
had considerable estate, and that the mother lived apart from
her husband and principally directed the child's education,
restrained the father from interfering without the consent of
two persons nominated for that purpose ; and with reference
to the objection that the court had no jurisdiction, he added
that he knew there was such a notion, but he was of opinion
that the court had arms long enough to reach such a case, and
to prevent the father from prejudicing the health or future
prospects of the child ; and he signified that he should act
accordingly. (*Creuze* v. *Hunter*, 2 Bro. Ch. 499, n.; 2 Cox
Eq. 242. And see *Whitfield* v. *Hales*, 12 Vesey, 492.)

The leading case on this subject is *Wellesley* v. *Duke of Beau-
fort*, which went on appeal from Lord ELDON to the House of
Lords, and in which the learned lord chancellor was unani-
mously affirmed. (2 Bligh's New Reports, 124; Schouler's
Domestic Relations [fifth ed.], § 246.)

Lord REDESDALE, in a luminous opinion in the House of
Lords, goes over the ground of the jurisdiction of the Court of
Chancery in cases of infants. Speaking of the case before
him he said : " Upon what ground is the court required to
maintain these children out of their property and not at the
expense of the father ? It is because that father is an improper
person to have the care of these children ; and, as it is pro-
posed that their maintenance and education should be put out
of his control, it is, therefore, as he may refuse to afford them
more than will supply them with their bare maintenance,
which the law of the country would require from every person
who had the means to maintain his children; it is for that
reason that the court is to take upon itself, out of the property
that those children have, instead of accumulating the income
of their property for their benefit, till they should be capable

62

of taking possession of it themselves, to apply a part of it for their maintenance and education."

It appears generally in this case that the father was a dissolute and abandoned character, and totally unfit to discharge the duties of a parent towards his children. It was under these circumstances that the Court of Chancery interfered and took the children from his custody and control.

It is such a power as is here disclosed that is now exercised by the Supreme Court of the state of New York; and, in a case where there has been interference by the court to protect and care for the child at the public's expense, that power seems only to be limited by the necessities of the case, having a due regard for the welfare of the infant.

This power is fully recognized in *Wilcox* v. *Wilcox* (14 N. Y. 576), where it was held that a court of equity has jurisdiction and authority to take a minor child from a guardian appointed by a surrogate on the death of its father and to deliver it to the care and custody of its mother where this is for the advantage of the child.

In the case cited the court was set in motion by a petition of the mother.

It appeared that the respondent and Nathan B. Wilcox, the son of the appellant, were married in 1838; they had two daughters, one nine and the other seven years of age; that after the birth of the first daughter her mother was in too feeble health to take care of her, and she was placed and taken care of in the family of her grandfather, where she afterwards continued to reside except during short intervals. Within a few years after the birth of the first child the father failed in business and became intemperate, and the respondent, with her other daughter, went to her father's and there resided with him until his death in 1852. The father was of large estate, and by his will made ample provision for his daughter and the children. The father of the children died in 1854 without having made any legal disposition or guardianship of the eldest child. A few days after his death the grandfather was appointed by the surrogate the general guardian of the eldest

child; the respondent was at this time temporarily absent from the state, and the appointment was made without notice to her or any other relatives.

It thus appears that the eldest daughter had been placed in the custody of the grandfather voluntarily and had remained there for years; and yet, when circumstances had changed, and the mother became possessed of ample means, the court intervened and restored the child to the custody of the mother, notwithstanding the relations that had grown up in the grandfather's family between the child and other relatives there residing and without regard to the letters of guardianship that had been duly issued to the grandfather.

While the decision in this case was rendered upon a divided court, there was no difference of opinion as to the main proposition that the court was possessed of this power. The only question upon which the judges were at variance was whether the power could be exercised at chambers or at a regular session of the Special Term.

In later cases it has been held that considerations affecting the health and welfare of a child may justify the court in withholding the custody of it temporarily even from the father acting as its legal guardian, and that they were so purely matters of discretion with the court of original jurisdiction that this court will not review the conclusion thereon unless some manifest error or abuse of power is made to appear. (*Matter of Welch*, 74 N. Y. 299; *People ex rel. Pruyne* v. *Walts*, 122 N. Y. 238.)

Many other cases might be cited, illustrating the general and ample powers of the Court of Chancery in the premises, but it is unnecessary.

It is urged on behalf of the petitioners and respondents that the restoration of these children can be effected under the general provisions of the Poor Law of the State (R. S. vol. 5 [Banks & Bros.' 9th ed.], p. 3373) on the ground that they have, since the fifth day of June, 1895, been a charge upon the poor fund of the city of Rochester.

Section two enacts: " A poor person is one unable to main-

tain himself; and such person shall be maintained by the town, city, county or state according to the provisions of this chapter."

Further on the section provides: " The town poor are such persons as are required by law to be relieved or supported at the expense of the town or city."

Section fifty-six provides in detail for the commitment of poor children under sixteen years of age.

Chapter four hundred and thirty-eight of the Laws of 1884, entitled " An act to consolidate the statutes of the state relating to the custody and care of indigent and pauper children by orphan asylums and other charitable institutions," is still in force. (See vol. 2 Birdseye's R. S. [2d ed.] p. 2308, where he inserts § 4 of this chapter as § 56d of the Poor Law.)

The section deals generally with the removal of children from one institution to another, and also provides for delivery of a child into the custody of the parent. It reads as follows: " But no parent of such pauper child, so in such asylum or other institution as in this section aforesaid, shall be entitled to the custody thereof, except in pursuance of a judgment or order of a court or judicial officer of competent jurisdiction, adjudging or determining that the interests of such child will be promoted thereby, and that such parent is fit, competent and able to duly maintain, support and educate such child."

We have here disclosed a statutory scheme in regard to the committal and subsequent discharge from custody of poor children that is practically in line with the general chancery powers of the Supreme Court.

In the case of *People ex rel. Inebriates Home for Kings County* v. *Comptroller of the City of Brooklyn* (152 N. Y. 399) Chief Judge ANDREWS while writing upon a kindred subject states, at page 407, as follows: " The duty of the state is discharged when it affords necessary relief to those whose support is cast upon the public, and it is plain that it should be given for such a length of time only as necessity demands. There is nothing more to be deprecated than encouragement to pauperism, or the extension of public aid to those who are

able to support themselves, or the keeping of inmates in charitable institutions, whether children or adults, beyond the time that they can be self-supporting, or when they could be safely allowed to shift for themselves. Nor are institutions of charity subserving their proper function when they relieve friends or relatives of indigent persons, able and bound to maintain them, from the burden of their support."

It is true that the petition in this case is an appeal to the general equitable powers of the court and is not filed in the statutory proceeding, but it is evident that whether, in the Supreme Court, or based upon the statute, the questions controlling are the same, to wit, the best interests of the child and the ability of the parent, both moral and financial, to discharge his duty in the premises.

The order of the Appellate Division should be affirmed, without costs.

All concur.

Order affirmed.