### In re MURTHA.

(Supreme Court, Special Term, New York County. January 29, 1915.)

1. INFANTS ⬤⇒19—CUSTODY OF CHILD—COURTS—JURISDICTION OF.

　　The Supreme Court in equity, as the successor of the Court of Chancery, has power to control and dispose of minors for their best interests, even against the will of the parents; and hence that tribunal has jurisdiction of a petition by parents for the restoration to them of a minor child committed by the Magistrate's Court to a reformatory.

　　[Ed. Note.—For other cases, see Infants, Cent. Dig. §§ 6, 8–15; Dec. Dig. ⬤⇒19.]

2. INFANTS ⬤⇒19—COMMITMENT—RIGHT TO REVIEW.

　　Where the Magistrate's Court committed a young girl to a reformatory on the ground that she was associating with dissolute persons and in danger of becoming morally depraved, and it appeared that, though incontinent, she was below the age of consent, the proceeding was not quasi criminal, for the girl was legally incapable of committing crimes; and hence the Supreme Court had jurisdiction of a petition by the parents for her restoration.

　　[Ed. Note.—For other cases, see Infants, Cent. Dig. §§ 6, 8–15; Dec. Dig. ⬤⇒19.]

3. INFANTS ⬤⇒19—JUDGMENT—CONCLUSIVENESS—SCOPE.

　　An order of the magistrate committing a young girl to the reformatory, on the ground that she was in danger of becoming a dissolute person, is

---

⬤⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

not a conclusive adjudication preventing subsequent proceeding by the parents for restoration; the first proceeding being on the complaint of an officer, and the latter being on the petition of the parents.

[Ed. Note.—For other cases, see Infants, Cent. Dig. §§ 6, 8–15; Dec. Dig. &⇒19.]

**4. PARENT AND CHILD &⇒2—CUSTODY—RIGHT TO.**

A father, who deserted and failed to support his family for over six years, and was not then able to care for them, forfeited all right to custody of the minor children which he might have by nature.

[Ed. Note.—For other cases, see Parent and Child, Cent. Dig. §§ 4–32; Dec. Dig. &⇒2.]

**5. INFANTS &⇒19—CUSTODY—ACTIONS—EVIDENCE.**

On a petition by parents for the restoration to them of their minor daughter, committed to a reformatory on the ground she was in danger of becoming morally depraved, evidence *held* to show that the child should not be given to the parents.

[Ed. Note.—For other cases, see Infants, Cent. Dig. §§ 6, 8–15; Dec. Dig. &⇒19.]

In the matter of Marguerite Murtha. Petition by her parents for the restoration to them of their daughter, who had been committed to an institution for the care and reformation of young females. Petition denied.

Mirabeau L. Towns, of New York City, for petitioners.

Timothy J. Shea, of Syracuse (William N. Dykman and Jackson A. Dykman, both of Brooklyn, of counsel), for respondent.

GOFF, J. The father and mother of a girl in her fourteenth year petition the Supreme Court for restoration to them of their daughter, who has been committed by a magistrate in the Children's Court to the Protestant Episcopal House of Mercy, an institution for the care and reformation of young females.

On complaint of an officer of the Society for the Prevention of Cruelty to Children, Marguerite Murtha was, on the 24th day of November, 1914, arraigned in the Children's Court as a young female who associated with dissolute and vicious persons, and who was in danger of becoming morally depraved. At the hearing, the mother being present and questioned, it developed that during the summer months the girl, without the knowledge of her parents, associated with one Samuel Jacobson, and, finding herself pregnant, left her home and lived with him. Some talk took place between the couple as to a marriage in New Jersey, but it was fugitive, and nothing was ever done to make it effective. At the close of the hearing the magistrate found the girl "to be in danger of becoming morally depraved," and committed her to the institution named. From the somewhat desultory statements it may be safely deduced that Jacobson was indicted in the County Court of Kings County (presumably for statutory rape), and on a plea of guilty for a lesser offense sentence was suspended.

At the threshold the respondent contends that as a matter of law the petition should be dismissed on one or all of three grounds: First, that the Supreme Court has not the power to grant the prayer; sec-

ondly, that, if it has the power, it should not exercise it in a quasi criminal case; and, thirdly, that the finding of the magistrate is res adjudicata.

[1] Against the first contention petitioners cite and rely on the case of Matter of Knowack, 158 N. Y. 482, 53 N. E. 676, 44 L. R. A. 699. While that case differs from the one at bar in respect to the character and cause of commitment of the children, yet it was similar in the controlling question before the court. There, as here, the proceedings initiate were a petition to the Supreme Court by parents for restoration of their children who had been committed to an institution, and the contention was made that the court was without power. That contention was characterized by the Court of Appeals as "a startling doctrine," and it was overruled. While the facts of the case were recited and necessarily adverted to in the opinion, yet I do not find any expression that would warrant a limitation of the ruling to a case resting on similar facts. It was a broad and unqualified assertion of the doctrine that the Supreme Court in equity, as the successor of the Court of Chancery, had the power to control and dispose of minors for their best interests, even against the will of the parents. In an historical as well as a legal sense there is on this subject a wealth of learning to reward the student of research, an indication of which may be found in the opinion of the learned judge who wrote for the court Further citations of authorities or quotations from text would be superfluous, if not pedantic; but attention may be invited to Mercein v. People, 25 Wend. 64, 35 Am. Dec. 653, where elaborate discussion of the subject will be found, including the declaration of Paige, Senator, that "there is no parental authority independent of the supreme power of the state," and the corollary is that since the state may take the child from the parent it may restore the child to the parent. In recent years there has been manifest a quickened public sense of the obligation of organized society to care for and protect the child. It has taken form in legislative enactments, incorporation of societies, and establishment of protective and reformatory institutions. These are instrumentalities and agencies designed to facilitate the administration of the law and to provide efficient means for its enforcement. But in no sense was it the purpose, even if such could be done, to limit or abrogate the power of the Supreme Court. It is true that equity follows the law, and it is also true that equity tempers the law, and under our judicial system it is not legally conceivable that a court of equity through its inherent power cannot correct mistakes, relieve from oppression, or assert the legal supremacy of the right in all cases where the welfare of the child and the interests of the state demand it.

[2] It is urged that the proceeding before the magistrate was in its nature quasi criminal, and therefore that the court is bound by the commitment. Recourse for authority is had to the Knowack Case, supra, where the causes for the commitment of minors are grouped in three classes—criminal, quasi criminal, and protective. This classification was evidently adopted for convenience of expression and illustration, but it cannot be held controlling as a rule of positive law.

For instance, it did not exclude all other causes for commitment except those named, nor did it classify the cause for commitment here as quasi criminal. Apart from what is obvious, that, the question not being before the court, it could not have been decided, the contention is based on a fallacy. At best the use of the term is fraught with the danger of misapplication. The prefix "quasi" contains an element of self-contradiction. It imports similarity and difference. The conduct imputed to this girl was either criminal or not. If it was not criminal, it could not be "quasi." It might be immoral, but all immoral acts are not crimes. In this conduct she was legally incapable of committing a criminal act. The law deprives her of volition. Upon the man alone was cast the onus of crime. He committed rape. The intercourse in the eye of the law was against her consent, because, being a child, she could not consent. As well might it be said that an adult woman, criminally assaulted against her will and consent, would be guilty of quasi criminal conduct. Taking the term in its most generally accepted meaning, it is confined to acts that, while not in themselves criminal, yet incur some penalty or forfeiture, as the violation of a municipal ordinance. While the conduct of this girl may have justified state interference for her protection, yet it was neither criminal nor quasi criminal, nor did she incur penalty or forfeiture.

[3] That the decision of the magistrate is res adjudicata is an untenable proposition. Were the parties the same and the subject-matter identical, there might be force in it as a plea; but neither essential element is present in this proceeding. It is not necessary to entitle all the authorities cited by the respondent in support of this proposition. None is applicable. They were all founded on habeas corpus proceedings, and such should not be confounded with a special proceeding by petition. Inquiry here is not directed to or confined to the validity of the commitment, nor is it an appeal from or review of the magistrate's finding. It is a proceeding which enables the court in the due exercise of its plenary powers to adopt such measures as may best serve its purpose to ascertain all the facts and circumstances in the girl's life and home surroundings, in order that her best interests be considered and protected.

[4, 5] For this purpose I directed that the girl, her parents, and all persons possessed of knowledge relative to the inquiry should be presented and examined in court. In the main the examination was conducted by me, and from it and the impressions produced by the manner, the appearance, and character of the persons examined my opinion was formed. For six years the father has abandoned his home, wife, and children. He neglected to provide for them, and wholly failed in his duty as husband and father. Whatever rights he may have had as guardian by nature, he has forfeited by his ignoble conduct, and at a time of life when his daughter most needed a father's guidance and protection she had neither. He cannot provide a home nor maintenance for her, and he is unworthy of being intrusted with her care and protection.

Left alone in the struggle for life, the mother was compelled to go out to work, that she might earn the support of herself and chil-

dren. This necessity entailed absence from home, so that after school hours and during school vacation the girl had uninterrupted opportunity to form dangerous associations, which had led to the unfortunate condition in which she is now placed. With her mother's yearning to care for her daughter during her approaching ordeal I fully sympathize; but her circumstances in life, her burden of necessities, her inability to control in the past, endangering grave doubts of her ability to control in the future, impel me to the belief that she cannot adequately protect or guard her daughter's future during her minority. Nor should there be withheld consideration of the humiliating position in which the girl would be placed, were she returned to her mother's home. That stigma of shame which attaches to motherhood without wifehood becomes indelible in the atmosphere of neighborhood, and whatever chance there may be of soothing the sting of censure and strengthening the moral fiber, it is not likely to be present in the environment that conduced to the downfall.

During the examination Jacobson, in answer to questions, expressed his willingness to marry the girl, and she assented. To legitimatize by marriage the unborn offspring of their relations is a matter of such grave concern, not only to the prospective mother, but to society, that were there a reasonable probability of the promise being fulfilled, and of its fulfillment tending to the welfare and happiness of the girl, I was strongly inclined to withdraw her from the institution that the marriage might take place. But there is not, in my opinion, any probability that the marriage would be for her welfare and happiness. On the contrary, the indications are that it would be used as a pretext to secure her discharge from the institution and result in evils far outweighing the plausible advantages. Jacobson is about 19 years of age. He lives with his parents. Since his school days he has worked intermittently at a trade. For two years he led an idle life. He is idle now. He does not support himself. He could not support a wife. If he married, his wife would have to further burden her mother. He took this girl child and lived with her as a matter of course. His talk of marriage was vaporous. He does not seem to appreciate the moral or legal obligation of husband or father. At present he is leading a life of ease, and marriage would not alter his habits. Not without perplexities have I come to the conclusion that, notwithstanding the urgency of marriage for the purposes aforementioned, it would be a greater misfortune for the girl than the one that has befallen her.

With insistence it is urged that, since the man who committed a crime was allowed his freedom and the girl who was legally innocent was deprived of hers, this apparent inequality in the administration of justice should now be corrected by granting the prayer of this petition. It is true that in this situation there is an anomaly, but the subject is one for discussion in the abstract. I am concerned only with the concrete question presented by the petition, whether the welfare and interests of the girl would best be served by allowing her to go to her mother. Balancing the probabilities in the light of past occurrences and present conditions, I have come to the conclusion that the girl should remain in the institution, and the petition is denied.