Justine Wise Polier, J.
In 1962 the Legislature, in enacting the new Family Court Act, imposed the requirement that when children were placed away from their homes by this court, placement could be extended only on regular judicial review.[1] The comments of the Joint Legislative Committee on Court Beorganization note that: 1 ‘ This section is designed to assure an annual review of a placement and establishes a technique for *902 holding the agency accountable for its treatment of the child and its program.”[2]
The care of the three children in these proceedings for whom extended placement was requested by the agencies with whom they were placed evidences the wisdom of the Joint Legislative Committee and the Legislature in providing for such review. It also evidences the need for facilities and personnel through which the legislative intent can be implemented. Finally, it presents the classic and tragic story of what is happening to abandoned, neglected nonwhite children whose only hope for growing up in a permanent home is through adoption.
Ellen Bonez, the four-year-old little girl who was born out of wedlock, had been abandoned by her mother at the age of eight months in May, 1962. Since then, although she has no family to which she can be returned, she has been placed in a congregate shelter and in three foster homes. Describing her as of superior intelligence and beauty, the agency saw the problem of adoptive placement as due to ‘ ‘ her dark skin coloring despite the fact that she is an appealing, attractive, alert child. ’ ’
Since 1965, when the case appeared for judicial review on an application for extension of placement, the court has requested that the voluntary agency having custody should actively seek an adoptive home. It was not until October that the agency, in the absence of a suitable adoptive home, agreed to make referrals to seven other adoption agencies for an adoptive placement. Two of these agencies have responded positively and agreed to seek an adoptive home.
Martin Ruiz, who is nearly two years of age, was abandoned when he was in a hospital as a newborn infant. Found neglected by this court, he was placed in congregate care and remained in such care until he was 16 months old. Then he was placed in a foster home where he still remains. He was described as an adorable and responsive infant with white complexion and keen features at 8 months of age. The agency having custody, however, stated that chances of adoption were slim for Negro and Puerto Rican children, and requested extension of placement for 18 months just before his first birthday in January, 1965.
The court requested the voluntary agency to seek adoptive placement and requested the Department of Welfare to report on what resources they could provide. The department notified the court that it did not accept Catholic or Jewish families, and that its direct adoption services were “ set up to implement *903 private voluntary agencies to assist with Protestant Negro children.”
When the court insisted on studies of this child and adoptive planning, many months passed before the voluntary agency reported, in September, 1965, that the child had been “ cleared for adoption ” by its psychologist. The mother was located and agreed to surrender the child for adoption. The voluntary agency reported in October that Martin had been referred to their adoption unit, and that a surrender had been sought through the Department of Welfare in November. One month later, the voluntary agency reported that the Department of Welfare would not take a surrender from the mother since “ no home was available for the child at this time.” The requirement that a specific home be available before a mother is permitted to surrender a child is generally imposed when a child is nonwhite. In this case its imposition endangered adoption since the mother had disappeared on two occasions. The department now imposed another condition to accepting a surrender — that the court commit to the Department of Welfare, thus surrendering jurisdiction and, with it, all responsibility for the welfare of this child.
Such restrictive requirements conditioning the acceptance of surrenders of children born out of wedlock seem inconsistent with the powers and duties of the Commissioner of Public Welfare as set forth in the Social Welfare Law: “ When in his judgment it is advisable for the welfare of the child, [he shall] accept the surrender of a child by an instrument in writing in accordance with the provisions of this chapter. Any inconsistent provision of law notwithstanding, the acceptance by the public welfare official of an absolute surrender of a child born out of wedlock from the mother of such child shall relieve her and her parents from any and all liability for the support of such child.”[3]
Bess Parsons, four years of age, is the youngest of eight children, all of whom have either been abandoned by their parents or removed from their parents because of neglect during the past 13 years. Six children now in placement, the first having been placed in 1952, have never been visited by either parent. Despite such abandonment, no action has ever been taken, by either the voluntary agencies for these children, who will continue as agency boarders and whose support will total well over a quarter of a million dollars by the time the public subsidies are ended and these children have to go out into a world in which they belong to no one.
*904 The history of the parents is replete with mutual abuse, alcoholism, indifference to the children, and emotional disturbance. Three of the children were never taken home by the parents when they were born, and were placed by the Department of Welfare in 1954, 1956 and 1959. The only child over whom this court now has jurisdiction was born in 1961, and removed by this court as neglected in 1962. The father died in 1963 and the mother is entitled to and is receiving social security. Although entitled to social security for this child and the five others still in placement, she has made no plans to care for her or for the other children and has not even visited them. In fact, despite urging by the agencies having custody, she has refused to do so.
This court was requested to extend placement in January, 1965 for further agency care. On reviewing the record of this child and that of her siblings, this court felt that such extension was not in the best interest of this abandoned child. Instead, it continued a remand for a report from the Department of Welfare on what efforts had been made to work with the parents toward the return of the children or to terminate parental rights and free them for adoption. No satisfactory answer was ever received. Although the clinical study of the child reported Bess to be an “ attractive, small but well-proportioned four-year-old Negro child” and “reflected the child’s ability to function at or above her own age level in social situations,” the Department of Welfare expressed the conclusion that adoption was neither a realistic nor feasible plan. This position can only be explained on the assumption that a nonwhite child is not entitled to or cannot be considered for adoptive placement by the department unless Protestant and Negro.
Counsel for the agency which has resisted referral of this healthy, attractive nonwhite child for adoptive care, has stated in court that his agency believes in only limited application of the statutory authorization to free a child for adoption where there is permanent neglect. It regards foster home care as meeting all the child’s needs.
This court cannot agree that it can approve extended placement for this abandoned four-year-old little girl, whose father is dead and whose mother has refused to visit her or plan for her although able to do so. To approve extended placement and so authorize public subsidy for year after year would mean that this child, like her older siblings, will be destined for a series of foster home placements and become just one more agency child without a family.
*905 This child has no legal status in the foster family, and the foster parents have no legal responsibility to provide continuing care beyond their convenience or desire to do so. Two of her siblings have been in three different foster homes since placement in the same agency. Studies of foster homes throughout the country show the high percentage of cases in which children in foster homes are moved through a succession of placements until they become rootless and incapable of any sense of belonging.
In view of the record and this court’s obligation to act in the best interest of each child, it must now seek a permanent home by all adoption agencies in this area, through the Probation Department.
On review of the applications for extended placement in these three cases, this court finds that the granting of such application would not be in the best interest of these three children. They are healthy, intelligent, attractive toddlers in need of permanent homes in which they can find the security that only adoptive parents can provide. The extensions requested do not offer promise of permanent homes, and each extension makes adoptive placement less likely.
In the case of Ellen, the abandonment by the mother, her subsequent death and the unfitness of the putative father clearly demonstrate the need for adoptive placement. In the case of Martin, the abandonment by the mother and her decision to surrender for adoption leave no question that he is entitled to adoption. Bess has been in placement since she was one, unvisited by either parent, and her mother, the surviving parent, has failed and refused to visit her in three years or to plan for her return home though able to do so. There could be no clearer case of permanent neglect.
This court has, through repeated requests and adjournments for 12 months, sought the co-operation of the voluntary agencies having custody of these children placed by this court, in order to secure adoptive placements. It is unfortunate that the planning for adoptive placement was not initiated by the agencies. However, at the present time the agency having custody of Ellen and Martin is now seeking adoptive placement. In the case of Bess, the agency has opposed such placement. While the views of social agencies are entitled to respectful consideration, this court cannot abdicate the responsibility under the law for determining what is in the best interest of a child.
In seeking to secure implementation of the court’s finding that these three children required adoptive placement, it received *906 no co-operation from the Department of Welfare.[4] Bather it was confronted with nonresponsiveness, nonco-operation and obstructive tactics. Bequests by the court for information on available services were left unanswered. The Bureau of Child Welfare rejected referrals on the ground these were not Protestant Negro children. The surrender of Martin by his mother, who had twice disappeared, was not accepted.
The conclusion seems inescapable that the Department of Welfare, which has largely delegated its responsibility for the care of dependent and neglected children to voluntary agencies, is providing only infinitesimal adoptive services for Protestant Negro children. Without determining the constitutionality of public services that are restricted by race and religion, this court is satisfied that procedure under such discriminatory policies cannot govern the court’s determination of what is in the best interest of these children.
Provisions in the Family Court Act requiring annual judicial review of placements[5] and the provisions for the permanent termination of parental custody by reason of permanent neglect[6] both establish the clear legislative intent to prevent the indefinite placement of children away from home, their loss of visibility, and the failure to plan adequately for them. It is the duty of this court to see that these provisions shall be implemented on behalf of all children without regard to race, color or religion. It cannot condone discriminatory implementation either by a public or private agency so long as this court has jurisdiction and, therefore, responsibility for the welfare of a child.
In the cases of Ellen Bonez and Martin Buiz where the voluntary agency is now seeking adoptive placement in co-operation with other adoption services, the remands are continued to January 17,1966 for report on such placement.
In the case of Bess Parsons, where the agency has refused to refer for adoption, extension of placement is denied. Probation is directed to make referrals for adoptive placement directly to all adoption agencies in this area and report. The remand is continued to January 17, 1966 for such report.

. L. 1962, ch. 686; Family Ct. Act, § 355, subds. (b), (c); § 756, subds. (b), (c).

. See McKinney’s Cons. Laws of N. Y., Book 29-A, Part 1, Judiciary — Court Acts, § 355.

. Social Welfare Law, § 398, subd. 6, par. (f).

. The Department of Welfare has primary and basic responsibility for the provision of appropriate care for abandoned children. See Social Welfare Law, § 395; § 398, subds. 2, 5, 6.

. Section 355, subds. (b), (c); § 756, subds. (b), (e).

. Sections 611-634. The order may award custody to an authorized agency for the purpose of adoptive placement. In such case parental consent to the adoption is dispensed with. (Domestic Relations Law, § 111.) In 1962, section 384 of the Social Welfare Law was amended to give the Family Court jurisdiction over similar proceedings brought on the ground of abandonment.