Justine W. Polier, J.
The policy, the programs and the administration of public welfare have been greatly expanded and modified since a New York court held: “It is no part of the duty of the overseer [of the Poor] to seek him [the pauper] out and press these benefits upon him. He is not the chooser of the place and manner of his support, and must take what is to be had in the way the law confers it.” [1]
On this theory the court reversed a judgment for reimbursement holding there was no obligation to compensate a person *1081 who had voluntarily relieved a pauper. (Smith v. Williams, 13 Misc. 761, 762 [1895].)
The harsh and restrictive assistance to the poor inherited from the early Dutch arid English traditions in New York has been modified both in piecemeal fashion and by what have been regarded as comprehensive changes through constitutional and legislative amendment's.[2]
For a century this'State has recognized the need and the duty to provide “ for a more efficient and constant supervision of all the .charitable and reformatory institutions which participate in the public bounty, or are supported by taxation ”.[3] The State boards created for this purpose and to correct “ confusion ” in administration have undergone changes of name and have had their jurisdiction enlarged over the years.
However, it was not until after the depression and the initiation of Federal assistance that a new policy was articulated in this State through the Constitutional Convention of 1938. It was then that article XVII was entitled “ Social Welfare ”, and indeed a new declaration of policy was set forth under the title of Public Belief and Care: “ Section 1. The aid, care and support of the needy are public concerns and shall be provided by the state and by such of its subdivisions and in such manner and by such means, as the legislature may from time to time determine.”
In addition to continuing the duties of the State Board of Social Welfare (article XVII, § 2), the Constitution as amended provided: “ Subject to the limitations on indebtedness and taxation, nothing in this constitution contained shall prevent the legislature from providing for the aid, care and support of the needy directly or through subdivisions of the state; * * * or for health and welfare services for all children, either directly or through subdivisions of the state, * * * or for the aid, care and support of neglected and dependent children * * * *1082 through agencies and institution» anthorized by the State Board of Social Welfare * * * by payments, made on a per capita basis directly or through the subdivisions of the state.”[4]
It was not until 1940 that legislation was enacted to consolidate and clarify the provisions that had been developed separately and in overlapping function under the State Charities Law and the Public Welfare Law into ono Social Welfare Law.[5] 6This consolidation which reflected the consensus of many groups and diverse interests was, however, more directed to better structure and terminology than to a basic revision of services. In the words of the statute: (‘ Legislative intent. 1. The purpose of this act is to consolidate within the state charities law, hereby re-entitled social welfare law, the provision of the public xvelfare laxv, and to make such amendments as Avill eliminate repetitions and obsolete matter therefrom and provide uniform terminology therein insofar as practicable.”[6]
However, as long ago as 1904, the Attorney-General rendered an opinion holding that under the then section 9 of the State Charities LaAv of 1896, a private individual or corporation who agreed to care for persons at public expense Avas obliged to submit to scrutiny by the State Board of Charities Avhich had the right to knoAV that the provision made Avas suitable and proper, and that the obligations assumed Avcre fulfilled.[7]
Since that time the responsibility and authority of both the State Board of Social Welfare and the State Department of Social Welfare have been steadily enlarged. The power and duty to inspect, to supervise, to make rules, to make recommendations to the Governor and the Legislature, to establish regulations and policies for the administration of public assistance and care throughout the State and to advise institutions as to the best measures for the care and relief of their inmates have been mandated.[8] Administratixre responsibility xvas imposed on the county and city public Avelfare districts by the Social Welfare Laxv.[9]
By both constitutional and legislative action, successive steps have been taken since. 1784 to cope with the problems of children *1083 whose parents were unahle to support them, who were born out-of-Wedlock, who were abandoned, who were abused, or or who were in need of adoptive care.
The Social Welfare Law now provides: “A public Welfare district shall be responsible for the welfare of children who are in need of public assistance and care, support and protection, residing or found in its territory, insofar as not inconsistent with the jurisdiction of the family court. Such assistance and care shall be administered either directly * * * or through an authorised agency ’ \[10]
Under the Social Welfare Law, New York City is constituted a Public Welfare District and is made “ responsible for the assistance and care of any person who resides or is found in its territory and who is in need of public assistance and care which he is unable to provide for himself.* [11] The authorisation to provide direct services, to develop demonstration projects, and the duty “ to provide adequately for those unable to maintain themselves ” insofar as funds are available are spelled out,[12] It is significant that the section of the law dealing with aid to dependent children specifically states: “Aid shall he construed to include services, particularly those services which may be necessary for each child in the light of the particular home Conditions and his other needs."[13]
The law of this State thus clearly imposes on the State and its subdivisions the primary responsibility for providing the care that a child may need away from home either directly or through an authorized agency. In practice, the State has failed to fulfill its duty to secure services through authorized agencies to meet the needs of dependent, neglected children in foster homes or adoptive homes or to provide direct services where the authorized agencies fail or are unable to meet the needs of individual children. The extent to which the State through its publio welfare districts shall exercise responsibility for providing the care best suited to the needs of each child has been the subject of constant debate. Acceptance of the supremacy of the voluntary and sectarian agencies in the child care field, dependence on them, and appreciation of their services have dulled the edge of State supervision and prevented the establishment of essential, comprehensive public services. It has also led to undermining the recognition of accountability to the *1084 State on the part of the voluntary agencies which are tax supported and authorized to provide service's by the State.
While the State Department of Social Welfare has steadily increased direct services for children found to be delinquent or in need of supervision,[14] it provides no direct services for dependent children found to be neglected and in need of care away from their own homes within the City óf New York. It has also failed to exercise its duty and power to see that the subdivisions shall either directly or through authorized agencies provide those services which may be necessary for each child in the light of his needs.
The doctrine under which the New York City Public Welfare District has operated through its Bureau of Child Welfare has been that it will accept for direct care only those children whom *1085 the voluntary agencies reject. In accordance with this doctrine, the City of New York has gone so far as to create a congregate child-care institution for dependent and neglected children under the fiction that it is a private agency. The board is appointed by the Mayor, the budget is met 100% by tax funds, and the population is 98% non-white.
*1084 In turn, the New York City Public Welfare- District has failed to provide direct services or secure such services through authorized agencies so that all children shall receive “ those services which may he necessary for each child in the light of the particular home conditions and his other needs.” By tradition, custom and agreement with the' voluntary agencies it has resisted the development of public services even when this meant the denial of appropriate services to dependent and neglected children. At the present time it provides some direct temporary shelter care. It has developed direct foster home service and a minuscule adoptive service, but has limited these services with rare exceptions to some of the Protestant Negro children in need of such services. Non-white children have suffered most because of the failure of the public services to provide or secure adequate services and are found to remain months and even years in- temporary shelter care awaiting acceptance by private agencies for long-term care. The city Public Welfare District has continued to allocate children to private agencies for foster home care and for adoptive care even in the knowledge that they would not be accepted for the care needed and has continued to use public funds to maintain these children in shelter care or other forms of care that did not meet their needs. It has not been willing to exercise its responsibility to remove children from the no-child’s land of temporary, interim care, congregate care so long as a private agency would physically accept a child.
*1085 This doctrine of the Public Welfare District for the City of New York, like the court in 1895 in Smith v. Williams (13 Misc. 761, supra) has resulted in practices that require that a child shall be placed in any bed or service that is offered by a “ private ” agency, and that the child is not entitled to receive the kind of care best suited to his needs.
Under this doctrine and its resulting practices this court is also constantly prevented from exercising its solemn obligation to place neglected children in accordance with their best interest.
The Social Welfare Law specifically states: “ It shall be the duty of every public welfare official to render assistance and cooperate within his jurisdictional powers with every other public official and with the family court ”.[15]
However, in practice, on a finding of neglect it has become the practice of the Department of Welfare to refuse direct service for children through either its foster home or adoption units, if the child is in the cus tod y of a private agency. The court, therefore, is in practice made entirely dependent on the decisions of the private agency and is treated as a rubber stamp that is used only to secure continuing tax subsidies.
The instant case reflects the abdication of the State Department of Public Welfare and its subdivision the Public Welfare District of New York City for providing or securing the services this court finds in the best interest of the individual child. Instead of receiving “ assistance and cooperation” as directed by law, this court meets with silence and resistance in fulfilling its obligations. As a result this court must go to private agencies asking for service, must pursue the search, and must in the meantime authorize continuing payment of tax funds for services not in the best interest of the child at the rate of over $3,000 per year.
In an earlier decision dated January 10,1966, this court found that this child, born out-of-wedlock, and abandoned by her mother in 1962 when less than one year of age, was in need of adoptive placement.[16] The court noted that this child had been in a congregate shelter and in three successive foster home *1086 placements under the auspices of the voluntary agency which had requested extension of placement by this court for still another additional year. In that opinion, this court stated:
11 Describing her as of superior intelligence and beauty the agency saw the problem of adoptive placement as due to her dark skin coloring despite the fact that she is an appealing, attractive, alert child.
u Since 1965 [January], when the case appeared for judicial review on an application for extension of placement, the court has requested that the voluntary agency having custody should actively seek an adoptive home. It was not until October that the agency, in the absence of a suitable adoptive home, agreed to make referrels to seven other adoption agencies, for an adoptive placement. Two of these agencies have responded positively and agreed to seek an adoptive home. * * *
11 In the cases of Ellen * * * where the voluntary agency is now seeking’ adoptive placement in co-operation with other adoptive services, the remands are continued to January 17, 1966 for report on such placement. ’ ’
The continuing lack of effective action by the voluntary agency having custody of Ellen and the failure of the Department of Welfare to take any steps to assure this child appropriate placement in an adoptive home have again forced this court to actively intervene on behalf of this abandoned child. This court has experienced both overt and indirect resistance to the removal of the child from the voluntary agency hoarding home unit. Because of the elaborate pattern of resistance by both the voluntary and public agency to taking such action as this court found necessary in the best interest of Ellen, the history of this single case is reviewed. Since it is typical of the tragic history of many children now dragging out their lives on public subsidy in a succession of boarding homes without becoming part of a family, the facts are reviewed in detail.[17]
Elleti, horn August 7, 1961, had been remanded by the predecessor court (Domestic Relations Court of the City of New York) in May, 1962 when she was abandoned by her mother. After nearly three years of custody in the voluntary agency *1087 and its hoarding home division, extension of placement wan requested for an additional 12-month period under the New York State Family Court Act.[18] This act requires that when neglected children are placed away from their homes by this court, placement may be extended only on regular judicial review.[19]
On reviewing the application in January, 1965, this court questioned why this child abandoned in 1962 had not been considered for adoptive placement. The extension for placement was denied, but the child was continued on remand for the agency to explore adoptive placement. It was not until June 21, 1965 that the agency reported that Ellen had been tested recently in their developmental clinic and that there was no apparent contraindication to adoptive placement. The report added that the adoption department, however, was unable to recommend a suitable adoptive couple.
On September 9, 1965 the agency advised this court that they had a good adoptive possibility for Ellen, and that the adoptive study was under way and nearing completion.
On October 19, 1965 the agency reported that Ellen was making an excellent adjustment in her present foster home and emphasized the importance of placing this child in “a warm, secure long-term foster home with a foster family who is similar in coloring and cultural descent to Ellen”. The foster home was described as one “where it is forseeahle that they may adopt Ellen at a later date ”, In the same report the agency stated that it had (on the repeated urging of this court) referred Ellen to the adoption units of seven agencies and to its own adoption unit. The remand was continued by this court.
On November 18, 1965 the agency reported its adoption department had begun the study of a family which they felt might be acceptable for Ellen. No mention was made of the family study reported as nearing completion on September 9, 1965. It was also stated that two of the agencies to whom referrals had been made had accepted the referral of Ellen.
Three weeks later, on December 6, 1965 the agency advised this court that Ellen’s foster parents, who had been described as forseeable adoptive parents in October, had decided to move *1088 to Puerto Bieo and that Ellen was being prepared for an “unexpected transfer” to another foster home.
On December 23, 1965, the agency reported that the most recent foster home was suitable for Ellen, “ similar in both coloring and cultural descent, and predisposed to adoption ”. The court was also assured that their adoption department was continuing a search for an adoptive home and that Ellen was still on referral to the two adoption agencies which had accepted referrals.
Again on January 14,1966 the agency reported that Ellen had made a suitable adjustment in her new foster home and that “ she had been accepted by the family on the basis of her coloring and genetic origins” and spoke of the possibility of this family being prospective adoptive parents.
On February 4, 1966 the possibility of the use of the foster home as an adoptive home was reiterated and the agency also' promised co-operation with one of the adoptive agencies that had expressed interest in finding an adoptive home. However, five days later this adoptive agency advised the court in a letter that they understood that Ellen was in an excellent foster home, and.that adoption by this couple was reported to be a “ realistic possibility”. "
On February 25, 1966, the agency again reiterated that the present foster parents remained interested in Ellen as a possible adopted child and added: “Since this is Ellen’s fourth placement following six months in our nurseries, we do not feel that a removal from the home for adoptive placement through our or any interested agency should be considered until we have had the opportunity to fully explore the potentials of her present home in respect to her adoption.” The agency now requested a further remand for an additional six-month period.
On June 8,1966 without explanation as to what had happened to negate the foster home as an adoptive home, the agency stated: “ We have explored the use of an adoptive family from our agency for Ellen but they felt that although she is socially appealing and intellectually curious, her darker skin tone would create conflicts within the home and the community”. Again, a further six-month remand was requested to work out possible plans with a Syracuse agency through the Statewide Adoption. Exchange, and secure a decision to have the child freed for adoptive placement. Ellen had already been in the custody of this agency for over four years since she had been abandoned, and no legal steps had been taken to free her for adoption.
In the light of the record this court wrote on July 11, 1966 directly to the three adoptive agencies that had agreed to accept *1089 a referral to ask whether they would review their files and advise the court directly if they wore able to accept this child for adoptive placement.
On July 15, 1966 Spence Chapin advised this court that they had withdrawn only because the agency having custody had advised them orally that no assistance was needed. In a letter dated July 19, 1966, the State Department advised this court that although they had been able to locate a potential adoptive home, that the agency having custody was unwilling to participate in an interagency meeting to discuss placement as required by the procedures of the Statewide Adoption Exchange. In a letter dated July 25, 1966, Louise Wise Services, the third agency that had agreed to accept a referral also reported it had withdrawn from the case when informed by the agency having custody that its services were not needed.
The agency having custody had in no way informed the court of any of these occurrences, and, in fact, on June 8, 1966 had written to advise the court that it was requesting a further six-month remand while ‘ ‘ we will continue to work out plans with the Syracuse agency”.
During this entire period the Public Welfare District for New York City had remained silent and unco-operative. Its lack of responsiveness, together with the resistance to adoptive placement by the agency having custody has resulted in this superior, attractive child being placed in a shelter, a congregate institution and three successive foster homes. It has forced this court to assume direct and personal responsibility for finding an adoptive home. It has caused the taxpayer to continue to pay for foster care for this child at the rate of over $3,000 a year for the three years following the 12 months’ period required for adoptive placement of an abandoned child.
This case illustrates that without the development of public services for children or the enforcement of accountability by private agencies to either the State Department of Welfare or its subdivision, children will continue to be left in inappro-. priate care at great expense to the taxpayer and irreparable damage to the children. This court to fulfill its obligations under law is entitled to receive the assistance and co-operation of the State Department and its political subdivisions in far different fashion.
Fortunately, in the instant case, Spence Chapin Adoption Service is able to provide an appropriate pre-adoptive home without further delay. The remand to the New York Foundling Hospital is terminated. Placement is made to Spence Chapin Adoption Service effective July 25, 1966 with the privilege to *1090 place in a pre-adoptive home pending action to free Ellen for adoption.
The case is adjourned to October 17,1966 for report by Spence Chapin Adoption Service on Ellen’s adjustment in adoptive home and for filing of adoption petition.

. For an excellent brief summary of the history of Social Welfare Law in New York up to 1940, see Nathaniel Fensterstock, History of New York Social Welfare Legislation (1941), McKinney’s Cons. Laws of N. Y., Book 52-A, Social Welfare Law, pp. IX-XLIV.

. (See L. 1784, ch. 43.) It was only in 1875 that the Legislature acted on the recommendation of a committee appointed by the State Senate in 1856 to receive children from poorhouses and place them in orphanages for special care. (L. 1875, ch. 308; see, also, L. 1875, ch. 173.)

. (L. 1867, ch. 951.) The legislation of this year created a Board of State Commissioners of Public Charities to visit and examine into the affairs of all charitable institutions of the State. By subsequent regulation the name of this body was changed, its jurisdiction enlarged, and in 1894 the Constitutional Convention enacted a provision requiring the Legislature to establish a State Board of Charities to visit and inspect all institutions. (Art. VIII, § 11.) This board was again renamed in 1931 as the State Board of Social Welfare. (L. 1929, ch. 654.)

. Art. VII, § 8; amended and appiwed Nov. 6,1951; amended and approved Nov. 7, 1961.

. L. 1940, ch. 629.

. L. 1940, ch. 619, § 18, subd. 1. (See L. 1940, ch. 102, described as providing substantive changes.)

. See 1904 Atty. Gen. 371, 373.

. Art, 2, §§ 17, 18, 11, 20, See art, 2, § 34, subd. 3, par. [d]: “ The commissioner " * * shall exercise general supervision over the work of all local welfare authorities ”.

. Art. 3, | 61.

. Social Welfare Law, til. 2, art. 6, § 395. See, also, section 398 defining additional powers and duties of the Commissioner of Welfare for children.

. Art. 3, §§ 61, 62;see, also, art. 6, § 131.

. Art, 3, § 113; art. 5, § 131, subds. 1, 2,

. Art. 5, § 344, subd. 2.

. See, Polier, A View From The Bench, Nat. Council on Crime and Delinquency, 1964, pp. 32-33. In 1920 more than three quarters of the delinquent children committed by the court were sent to private institutions. By 1956, the State provided direct care for more than two thirds of such children, and private institutions for less than one third.

, Art. 5, § 135, subd. 1.

. See Matter of Bonez, 48 Misc 2d 900 (1966).

. “We know that the nnvisited child with no permanent parental ties is the potentially sick, delinquent, or, at least inadequate and unproductive adult of tomorrow.” Statement by The Committee on Adoption of the Community Cotiiicil of Greater New York addressed to the Joint Legislative Committee on Child Care Needs of the state of New York (March, 196(1). The committee is composed of 22 püblic and private agencies in New York City, Nassau, Suffolk and Westchester Comities. Only one agency abstained from signing the statement.

. L. 1962, eh, 686; Family Ct, Act, § 355, subds. (b), (e).

. The comments of the Joint Legislative Committee on Court Reorganization notes that; “ This section is designed to assure an annual review of a placement and establishes a technique for holding the agency accountable for its treatment of the child and its program.” See McKinney’s Cons. Laws of N. Y., Book 29-A, following § 355.