## In the Matter of BESS P.*

Family Court, Juvenile Term, New York County, December 27, 1966.

*John J. Carlin* for Catholic Home Bureau.

---

* The name is fictitious for the purpose of publication.

JUSTINE WISE POLIER, J. Decisions involving the custody of a child not only as between parents (*People ex rel. Elder* v. *Elder,* 98 App. Div. 244; see *Finlay* v. *Finlay,* 240 N. Y. 429, 432, 433, 434 [1925]; *People ex rel. Fields* v. *Kaufmann,* 9 A D 2d 375 [1959]) but between nonparents (*Matter of Welch,* 74 N. Y. 299 [1878]) or as between an institution having custody and foster parents (*Matter of Mary I* v. *Convent of Sisters of Mercy in Brooklyn,* 200 Misc. 115 [1951]) have repeatedly held that the court's primary concern is the health, welfare, and best interest of the child. (See *People ex rel. Converse* v. *Derrick,* 146 Misc. 73, [1933].)

In the latter case an infant had been committed by the Commissioner of Welfare to a child-caring agency as a destitute and dependent child and as a charge against the City of New York. At the age of five months the infant was boarded out by the agency in December, 1946. Five years later the child was removed by the agency for the purpose of arranging adoptive placement, over the objection of the foster parents. Their request to adopt was referred under an agency rule limiting placement to adoptive parents under 40 years of age. The court noted that when the infant had first been placed out to board, the foster mother and foster father were 37 and 42 respectively. The foster parents promptly brought a writ of habeas corpus and the Department of Welfare intervened as a codefendant with the agency.

The court after taking evidence and observing the parties held that the foster parents should retain custody, finding that a contrary result would do irreparable and permanent harm to the child. The court also overruled the contention of the agency (1) that it had a superior right to custody of the child; (2) that the court's equity power should not be exercised so as to destroy the effectiveness of the placement and boarding programs and practices established by the public and private welfare agencies.

This decision in 1951 reiterates the decision made in 1899 in *Matter of Knowack* (158 N. Y. 482). In that case the court ruled that two parents whose four children had been removed when they had failed to provide proper care could not be retained by the Children's Aid Society, when the parents were able and eager to provide a good home when the children wished to return to their parents, and where the return of the children to their parents was found to be in the best interest of the children.

In *Matter of Knowack*, the Children's Aid Society was found by the court (p. 488) to stand upon the " bald proposition of

law already stated, that without its consent to their release these children are to remain in the custody of this institution during their minorities.''

In the years that have passed since the decision of *Matter of Knowack*, the charitable institutions have not taken the position that they alone are the arbiters of whether children may be returned to responsible parents. They and the public departments have, however, failed to take positive steps to rehabilitate families, to terminate parental rights or to seek adoptive placements. As a result hundreds of infants and small children continue to drag out their lives in institutions and successive foster homes without ever becoming a part of any family or achieving a sense of belonging. And all this is done through the continuing public subsidy of care without exercise of what should be regarded as a requirement of accountability by the public department for the expenditure of public funds and for continuing review of what care is in the best interest of each child.

The State Board of Social Welfare, the Department of Social Welfare, and the New York City Department of Welfare have been given responsibilities for visitation, inspection, and decision-making as to the continuing subsidy and care of children in the custody of agencies. While such legislative mandates have led to visits and studies, the review of each child's care to determine what is in his best interest has in fact become too largely a paper review with consequent approval of whatever the voluntary agency recommends.

To correct this situation insofar as children within the jurisdiction of the now Family Court were concerned, the Legislature imposed a specific requirement on this court that when children were placed away from their home by this court, placement could be extended only on regular judicial review.[1] The comments of the Joint Legislative Committee on Court Reorganization, reflecting the legislative purpose of this requirement, note that: '' This section is designed to assure an annual review of a placement and establishes a technique for holding the agency accountable for its treatment of the child and its program.''[2]

In the instant case, in January, 1965 this court was requested to grant an order for extension of placement for further foster home care for Bess who was then three and a half years of age. A review of the social history showed that she was the youngest

1. L. 1962, ch. 686; Family Ct. Act, § 355, subds. (a), (b); § 756, subd. (b), (c).
2. See McKinney's Cons. Laws of N. Y., Book 29-A following § 355. See, also, *Matter of Bonez*, 48 Misc 2d 900 (1966).

of 8 children all of whom had either been abandoned by their alcoholic parents or removed from their parents because of neglect during the preceding 13 years. The 6 children then in placement had never been visited by either parent. Despite the failure of all efforts to arouse interest in the children, neither the voluntary agencies having custody nor the Department of Welfare had taken any steps to terminate parental rights and free the children for adoptive care. They continued in a variety of placements on public subsidy.

In the light of this record, this court did not grant an order for extension of placement for 12 months. Instead, it continued the remand to the agency having custody, and requested a report from the Department of Welfare on what efforts had been made to work with the parents toward the return of the children to their parents or to terminate parental rights. No satisfactory answer was ever received. Although a developmental study secured by the court reported that Bess was attractive and able to function at above her age, the Department expressed the conclusion that adoption was neither a realistic nor feasible plan. In one of the companion cases the department advised the court that its Adoption Division had been set up " to assist with Protestant Negro children "—Bess was a Catholic Negro child.

A succession of rejections of Bess came from a series of voluntary adoption agencies, some on the ground of religion, some on the ground that they had no Negro homes, and some explicitly on the ground that the voluntary agency having custody either disapproved of adoptive placement or would not co-operate in such placement.

The agency having custody contended through counsel that it regarded foster home care as meeting all the child's needs. It did not disclose that the foster family was boarding six children for this agency and could not consider adoption of Bess. This information was secured only when the court directed the appearance of the foster mother in order to ascertain whether, as was suggested by the agency, the foster family might become an adoptive family.

On January 10, 1966 this court again refused the application for extension of placement for Bess and two other children, stating:[3]

---

3. *Matter of Bonez,* 48 Misc 2d 900, 904–905 (1966). As a result of the court's action and the ultimate co-operation of the agency having custody of the other children, one was discharged to the home of his maternal grandmother, and one was placed in an adoptive home through a nonsectarian agency.

" This court cannot agree that it can approve extended placement for this abandoned four-year-old little girl, whose father is dead and whose mother has refused to visit her or plan for her, although able to do so. To approve extended placement and so authorize public subsidy for year after year would mean that this child, like her older siblings, will be destined for a series of foster home placements and become just one more agency child without a family.

" This child has no legal status in the foster family, and the foster parents have no legal responsibility to provide continuing care beyond their convenience or desire to do so. Two of her siblings have been in three different foster homes since placement in the same agency. Studies of foster homes throughout the country show the high percentage of cases in which children in foster homes are moved through a succession of placements until they become rootless and incapable of any sense of belonging.

" In view of the record and this court's obligation to act in the best interest of each child, it must now seek a permanent home by all adoption agencies in this area through the Probation Department."

Since this decision and opinion was rendered one year ago, this court has continued to seek co-operation from both the Department of Welfare and the voluntary agencies. It has met with no practical response. The voluntary agencies have apparently closed ranks lest this court should be able to question their right to determine what kind of care is in the best interest of Bess. Despite the clear responsibility placed on the Department of Welfare " for the assistance and care of any person who resides or is found in its territory and who is in need of public assistance and care which he is unable to provide for himself," [4] the department has repeatedly defaulted in its obligation to non-white children.[5] It has limited its adoptive services to Protestant Negro children and has, despite full awareness of the inadequate adoptive services for other non-white children, refused to accept referrals, as in the instant case.

This court in the face of such resistance and in the absence of power to command the necessary facilities must acknowledge its inability to act in accordance with the needs and best interest of Bess. It cannot extend placement to an agency which regards foster home care as all that this child needs. The only alternative is to discharge this child to the Commissioner of Welfare.

---

4. Social Welfare Law, tit. 2, art. 6, § 395. See, also, § 398 defining additional powers and duties of the Commissioner of Welfare for children.
5. See *Matter of Bonez,* 50 Misc 2d 1080 (1966).

In doing so this court urges that the Commissioner shall review the policies and procedures of the Bureau of Child Welfare so that children abandoned by their parents and in need of adoptive homes shall not in the future be referred to child care agencies without hope of adoptive placement because of race, color or religion. It also urges that the policy and practices of the Bureau of Child Welfare shall be modified so as to provide equal and direct services for all children without regard to race, color or religion. Without such changes the racist and religious barriers to equal services to such children as Bess will continue to deny them the equal protection to which they are entitled.

Bess is discharged to the Commissioner of Welfare, effective December 27, 1966.