Desiree **PHELAN,** by her parents John **PHELAN** and Ellien Phelan, and John Phelan and Ellien Phelan, individually, Plaintiffs,

v.

Marisol **TORRES,** individually and as caseworker; Leta Macadaeg, individually and as supervisor; Juanita Bowers, individually and as director, Elizabeth Mullane, individually and as director of medical services; St. Vincent's Services, Inc.; Monica Hoover, individually and as caseworker;

Barbara Felton, individually and as manager; Robert Jackson, individually and as supervisor; Kathryn Croft, individually and as Deputy Commissioner; Nicholas Scoppetta, individually and as Commissioner; and City of New York, Defendants.

Desiree Phelan, by her parents John Phelan and Ellien Phelan, Plaintiff,

v.

Kings County Hospital Center; New York City Health and Hospitals Corporation; Jeffrey Birnbaum, M.D.; and Sundari Nandanavanam, M.D., Defendants.

Nos. 1:04–cv–03538–ERK–CLP, 1:06–cv–01663–ERK–CLP.

United States District Court, E.D. New York.

Dec. 30, 2011.

As Amended Jan. 3, 2012.

Carolyn A. Kubitschek, Lansner Kubitschek Schaffer & Zuccardy, New York, NY, for Plaintiffs.

Timothy J. O'Shaughnessy, McAloon & Friedman, Carl Judah Schaerf, Bruce Strikowsky, Schnader Harrison Segal & Lewis LLP, Patricia A. Murphey, Conway, Farrell, Curtin & Kelly, P.C., New York, NY, for Defendants.

## MEMORANDUM & ORDER

KORMAN, Senior District Judge:

Desiree Abson was born on December 5, 1995 at Kings County Hospital Center ("KCHC"). Desiree's mother, Darlene Abson, reported using alcohol and cocaine during her pregnancy, receiving no prenatal care, and "smok[ing] a pack of cigarettes daily since 1989." SVS Defs.' Rule 56.1 Stmt. ¶¶ 31, 32. Desiree remained at KCHC until the City of New York ("City"), through its Child Welfare Administration ("CWA"), the predecessor agency to the Administration for Children's Services ("ACS"), took custody of her on January 2, 1996 and later placed her with a foster care agency, St. Vincent's Services, Inc. ("SVS" or "St. Vincent's Services"). On February 1, 1996, after SVS placed Desiree in a foster home, Desiree began having seizures. After her third visit to the emergency room at KCHC, all of which occurred in February 1996, it was determined that Desiree had four broken ribs and bleeding in her brain. She was then diagnosed with Shaken Baby Syndrome, a devastating form of child abuse caused by violently shaking a baby, resulting in traumatic brain injury, which is characterized by a constellation of injuries including subdural hematomas (i.e., bleeding in the brain), retinal hemorrhages, rib fractures and long-bone fractures.[1] She was subsequently placed by SVS with John and Ellien Phelan, a foster care placement

---

[1]. See Ex. M, Ajl Dep. 57:18–67:12; see also Shaken Baby Syndrome, Medline Plus Medical Encyclopedia, a service of the U.S. National Library of Medicine, National Institutes of Health ("Medline Plus"), http://www.nlm.nih.gov/medlineplus/ency/article/000004.htm (last visited Dec. 29, 2011).

that led to her adoption by them on June 3, 1999.

On August 14, 2004, John and Ellien Phelan commenced an action pursuant to 42 U.S.C. § 1983 on behalf of Desiree, and on their own behalf, alleging among other things that the defendants violated Desiree's civil rights. Plaintiffs also alleged pendent claims under New York law. They named as defendants the City, St. Vincent's Services, and various employees of the City and SVS. The City employee defendants who remain in the case are Kathryn Croft, Robert Jackson, Barbara Felton, and Monica Hoover. The St. Vincent's Services employee defendants who remain in the case are Marisol Torres (now Zobler, hereinafter "Torres–Zobler"), Leta Macadaeg, and Elizabeth Mullane. See Pls.' Opp'n Br. 1.

On April 10, 2006, almost two years after filing the first complaint, plaintiffs filed a complaint pursuant to 42 U.S.C. § 1983 against KCHC, two doctors employed by KCHC and KCHC's parent, the New York City Health and Hospitals Corporation. The KCHC employee defendants are Dr. Jeffrey Birnbaum—an attending physician—and Dr. Sundari Nandanavanam—a first year resident. Plaintiffs allege, without any specific allegation that Dr. Nandanavanam, failed to provide Desiree with adequate medical treatment. Plaintiffs also alleged three causes of action arising under New York law. The two complaints were consolidated. After an unsuccessful motion to dismiss and the completion of discovery, all the defendants moved for summary judgment. In an unpublished Memorandum and Order, I granted the motion of each of the defendants. See Phelan ex rel. Phelan v. Torres, Nos. 04–03538 & 06–

01663, 2011 WL 6935354 (E.D.N.Y. Dec. 30, 2011). See Phelan v. Torres, Nos. 04-03538 & 06-01663, 2011 WL 6935354 (E.D.N.Y. Dec. 30, 2011). The only portion of that Memorandum and Order that warrants publication here addresses the liability of SVS.

## FACTUAL BACKGROUND

### A. Desiree's Placement in Foster Care

#### 1. Certification of Maitland

Janice Maitland, who would become Desiree's foster mother, initially applied to be a foster parent with SVS on November 8, 1994. Ex. FF, at SVS 3810.[2] She is a licensed Registered Nurse and, at the time she applied, had worked as a pediatric nurse for over twelve years. Ex. K, Maitland Dep. 22:23–24:22. From 1991 to 2000, Maitland worked in the neonatal intensive care unit at Brookdale Hospital. Id. at 23:7–13. "Pursuant to Section 424–a of the Social Services Law, St. Vincent's Services completed a background check of Maitland." SVS Defs.' Rule 56.1 Stmt. ¶ 97. The State Central Register ("SCR") Report on Maitland, issued on February 22, 1995, did not indicate any incidents of prior child abuse or maltreatment. Id.; Ex: FF, at SVS 3895. Desiree was placed with Maitland on January 2, 1996.

As part of the Foster Parent Application Process, Maitland's home was inspected on April 19, 1995. SVS Defs.' Rule 56.1 Stmt. ¶ 108. That same day, SVS case workers Sister Catherine Peter and Shelton Collins completed a home study and interviewed Maitland. Ex. FF, at SVS 3873–82. Maitland identified her sister, Elma Guillaume, as her backup in-home childcare provider. Ex. FF, at SVS 3880. Guillaume, who was

---

**2.** Letter exhibits refer to exhibits filed by defendants in support of their motion for summary judgment.

also a registered nurse, lived with her husband and one child. *Id.*; Ex. K, Maitland Dep. 56:5–11, 57:19–22. Although SVS was required to obtain an SCR clearance for Guillaume *before* certifying Maitland, it did not do so until June 4, 1996. Pls.' Rule 56.1 Stmt. ¶¶ 70, 367. Nevertheless, when it came, the clearance reflected no prior reports of abuse or maltreatment. Ex. FF, at SVS 3889.

On April 26, 1995, the New York State Department of Social Services certified Maitland as a foster parent to care for as many as three children (ages 0–8 years-old), for the period April 26, 1995 to April 26, 1996. Ex. FF, at SVS 3887–88. On October 24, 1995, Maitland submitted paperwork indicating that she could accommodate a wide range of classifications for foster children with various disabilities. Ex. FF, at SVS 3805–07. The document indicates that Maitland was willing to care for children with, e.g., brain damage, but was not willing to care for children with, e.g., HIV or "Exceptional Needs." *Id.* At the time of Desiree's placement, Maitland "was caring for two other foster care children," an eight-month-old girl and the girl's four-and-a-half year-old brother. SVS Defs.' Rule 56.1 Stmt. ¶ 87.

### 2. Foster care placement of Desiree with Maitland

On January 2, 1996, KCHC discharged Desiree. On the same day, the City placed Desiree under the care of SVS. Ex. KK, at 1075; Ex. LL, at 955–56. That evening, Desiree was placed in Maitland's home on a temporary basis until the home of Delores Magwood, who had adopted Desiree's biological brother, could be re-certified for foster care—a process which was expected to take two weeks. *Id.*; Ex. K, Maitland Dep. 66:23–67:4, 128:3–130:6.

On January 4, 1996, Marisol Torres–Zobler, a SVS social worker, met with Maitland and Desiree at SVS's offices for Desiree's initial medical intake examination, conducted by Dr. Matilda Bravo. Ex. FF, at SVS 0199, SVS 1645. A neurological evaluation indicated that Desiree was "jittery." *Id.* Dr. Bravo recommended that Desiree be tested for HIV, and Maitland consented to the test that day. *Id.* at SVS 1245; SVS 1567–70. On January 29, 1996, CWA provided SVS the requisite authorization for the HIV testing. *Id.* at SVS 1243. After the requisite authorizations were obtained, Desiree was tested for HIV on February 7, 1996. Ex. FF, at SVS 1237. The result of the test, which was available a few days later, indicated that Desiree had HIV antibodies. *Id.* Such a result very likely "reflects the mother's HIV status," rather than the baby's status. Ex. M, Ajl Dep. 512:18–513:2; *see also* Ex. N, Molofsky Dep. 46:23. Indeed, plaintiffs concede that Desiree *was not in fact HIV positive*. *See* Pls.' Opp'n Br. 12.

### B. Desiree's First Hospitalization

Sometime on February 1, 1996, though the record is not clear as to when, Maitland took Desiree to see a pediatrician, Dr. Melanie Bravo (not to be confused with the SVS pediatrician, Dr. Matilda Bravo, mentioned above), because Desiree exhibited twitching in both her left hand and arm and in her lower lip and chin. Ex. FF, at SVS 1078. Dr. Melanie Bravo examined Desiree and referred her to the KCHC pediatric emergency room. *Id.* Later that day, at approximately 8:40 p.m.—the very same day—Maitland had telephoned SVS to report that Desiree was irritable, her face was twitching and that Maitland would be taking Desiree to KCHC. SVS Defs.' Rule 56.1 Stmt. ¶ 170. Less than an hour later, at approximately 9:25 p.m., Maitland brought Desiree to KCHC for irritability and jerky movements with a blank stare. Ex. X, at 11–16, 27. During

the admitting physical examination, the physician witnessed a seizure. *Id.* at 32. Infection was among a number of possible causes considered in the differential diagnosis, and Desiree "was placed on Phenobarbital for the seizures and an antibiotic." Hosp. Defs.' Rule 56.1 Stmt. ¶¶ 5–6. Maitland called SVS again, at approximately 11:30 p.m., to report that Desiree was being admitted to KCHC. SVS Defs.' Rule 56.1 Stmt. ¶ 173.

On February 2, 1996, Dr. Schubert, a pediatric neurologist, who examined Desiree, noted that there was "[n]o evidence of head trauma." Ex. BB, at M001809. Nevertheless, she ordered a number of tests, including a "stat CT scan," an imaging method that uses x-rays to create cross-sectional pictures of the body. Ex. X, at 41. The report of the scan of Desiree's head, which was taken that same day, states that the "images are remarkable for unusually dense areas seen in the region of the straight sinus, transverse sinus and superior sagittal sinus." Ex. BB, at M001854. And that the "etiology of these regions of increased density include superficial sinus thrombosis [i.e., a blood clot] *or* acute subdural hematoma." *Id.* (emphasis added). An acute subdural hematoma is a collection of blood on the surface of the brain that results from a serious head injury.[3] Subdural hematoma is one of a constellation of indications of Shaken Baby Syndrome, along with retinal hemorrhaging, long bone fractures, and rib fractures. Ex. M, Ajl Dep. 57:18–67:12.[4]

The radiology report also recommended an MRI of the brain. Ex. BB, at M001854. Dr. Schubert testified that she agreed and directed that one be done. Ex. 79, Schubert Dep. 22:12–23:8; Ex. BB, at M001832. Dr. Schubert testified that "it

would have been helpful to have the [MRI, b]ut as [Desiree] stabilized, it became less urgent [because] it was no longer an emergency. It wasn't a question of acute management anymore." Ex. 79, Schubert Dep. 23:16–22. Ultimately, it was determined that the MRI would be done on April 11, 1996 at Downstate Medical Center, at the same time as Desiree's next clinic visit. *Id.* at 25:17–19.

Significantly, although plaintiffs' pediatric experts, Drs. Ajl and Molofksy, testified that most infants who have been shaken will have retinal hemorrhages, there was no evidence that Desiree had retinal hemorrhaging. Ex. M, Ajl Dep. 117:7–9; Ex. N, Molofsky Dep. 150:2–11. Nor was she observed to have had any bruises, abrasions, cuts, marks, injuries, or any further seizures during her first admission. SVS Defs.' Rule 56.1 Stmt. ¶ 248; Hosp. Defs.' Rule 56.1 Stmt. ¶ 10. Because child abuse was not considered a possible cause of Desiree's symptoms, she was treated for an infection and additional tests were run to rule out a metabolic disorder. *Id.* at 315:18–316:10; Ex. M, Ajl Dep. 316:11–17. She was discharged on February 16, 1996.

## C. Desiree's Second Hospitalization

Two days later, on February 18, 1996, at approximately 7:45 p.m., Maitland brought Desiree back to KCHC with complaints of nasal congestion, coughing and occasional vomiting after coughing. Ex. CC, at M000187, M000192, M000214. A chest x-ray was taken of Desiree later that night. The results of this x-ray were not discussed or reported in any clinical notes or typewritten report, on any date during this admission. A handwritten report concerning this chest x-ray, however, did not

3. *Subdural Hematoma,* Medline Plus, http://www.nlm.nih.gov/medlineplus/ency/article/000713.htm (last visited Dec. 29, 2011).

4. *See also Shaken Baby Syndrome,* Medline Plus, *supra* note 1.

indicate rib fractures. Ex. PP. Plaintiffs' expert, Dr. Ajl, testified that the rib fractures were seven to twelve days old—a time frame that suggests the fractures may have been caused by a procedure while Desiree was hospitalized, and not while she was in Maitland's home. *See Torres*, 2011 WL 6935354, at *22.

During the same visit, the attending pediatrician at KCHC, Dr. Jeffrey Birnbaum, examined Desiree and found her to be alert and active in no apparent distress, and that she had bilateral rhinorhea, i.e., runny nose, and congestion. Ex. CC, at M000200–201. Dr. Birnbaum testified that he was trained to identify signs of child abuse and neglect, and would have noted any signs of abuse if he noticed any while examining Desiree. Ex. J, Birnbaum Dep. 115:13–117:13. He did not note any signs of abuse. SVS Defs.' Rule 56.1 Stmt. ¶¶ 268–69. Because Desiree did not have any seizures during her second hospitalization at KCHC, Dr. Birnbaum's opinion was that Desiree's seizure disorder was under control. Ex. J, Birnbaum Dep. 49:2–8.

Nevertheless, Dr. Birnbaum failed to request and review Desiree's hospital chart from her first hospitalization, from which she had been discharged only two days earlier, although it was standard practice for KCHC doctors to request charts from prior hospitalizations when an infant was subsequently hospitalized. Ex. 64, Chari Dep. Tr. 35:9–18. Plaintiffs allege that the chart would have reflected a dangerous increase in Desiree's head circumference between her initial release from KCHC on January 2, 1996 and her second hospitalization on February 18, 1996. The evidence discussed in the unpublished Memorandum and Order, however, casts significant doubt to the whether any such unusual increase in the head circumference had occurred. *See Torres*, 2011 WL 6935354, at *23.

Desiree was discharged from KCHC on February 22, 1996. Hosp. Defs.' Rule 56.1 Stmt. ¶ 15. At that time, she was alert and active and her lungs were clear. *Id.*; Ex. Y, 742, 767. Desiree's hospital records for this admission do not contain any notes regarding any bruises, abrasions, cuts, marks, or injury to Desiree. SVS Defs.' Rule 56.1 Stmt. ¶ 269. Nor do the notes reflect any bruising, pain or tenderness to Desiree's rib cage. *Id.* ¶ 270. The diagnosis, following this hospitalization, was that Desiree had suffered from acute respiratory infection, convulsions, and anemia. *Id.* ¶ 277.

### D. Desiree's Third Hospitalization

On February 27, 1996, at approximately 4:30 a.m., Maitland brought Desiree back to the KCHC emergency room because Desiree had another seizure. Ex. Z, at 940–45. Initially, the cause of these conditions was again suspected to be an infection, "possibly HIV related." *Id.* at 974. Drs. Chari and Schubert noted that the possible etiology of Desiree's seizures included perinatal insult (i.e., birth trauma) and toxic embryopathy (i.e., birth defect). Ex. DD, at M000407.

Later on February 27, 1996, a CT scan of Desiree's head was performed. *Id.* at M000425. At approximately 8:15 p.m. on February 27, a KCHC neurosurgery physician was notified of the CT scan results, which "revealed bilateral subdural hematomas and multiple hypodensities." Hosp. Defs.' Rule 56.1 Stmt. ¶ 17. A chest x-ray taken that day indicated that Desiree's ribs were fractured. Ex. DD, at M000424. Nothing in Desiree's hospital records suggests that anyone communicated any information regarding rib fractures prior to February 27, 1996. Ex. N, Molofsky Dep. 360:13–361:3.

On February 29, 1996, at approximately 11:00 a.m., the first notation is made in

Desiree's hospital charts reflecting a suspicion of child abuse. Ex. DD, at M000275. The Pediatric Child Abuse Attending Physician, Dr. Ajl, who was consulted, wrote that "at present this child has at least 3 [left] posterior rib [fractures], [right] periostal [reaction,] [right] humerus, [*sic*] and bilateral subdural hematoma (old) and possible intracerebral infarctions.... This is shaken baby syndrome (eye exam pending)." Ex. Z, at 000978. At approximately 3:00 p.m., on February 29, 1996, Dr. Lim contacted the police, ACS, and SVS to report the suspected abuse. Ex. DD, at M000277.

When SVS was so notified on February 29, 1996, based on the x-rays showing rib fractures, Desiree (though still at KCHC) was "promptly pulled" from Maitland's care, Ex. M, Ajl Dep. 404:23–405:3, and Maitland's home was ultimately involuntarily closed by the City, Ex. 42, at Phelan 20102.[5]

### E. Proximate Cause of Desiree's Injuries

There is circumstantial evidence suggesting that at least some of Desiree's injuries were suffered when she was in Maitland's care. Not only did injury to Desiree occur during this period, but, when OCI interviewed Maitland, following the KCHC doctor's report that Desiree had been abused, Maitland stated that she had used a babysitter named "Marianne," whose last name and address she did not know. *Id.* at PHELAN 20071–72; Ex. 72, Graham Dep. 43:4–25. "Marianne" was never identified, located, or interviewed as part of the OCI investigation. *Id.* The only babysitter Maitland told SVS she would use was her sister, Elma Guillaume; yet, when interviewed by OCI, Guillaume

denied that she ever cared for Desiree. Ex. 42, at PHELAN 20093. Maitland also identified Desiree Abson as Shonda Arbun, on February 1, 1996, when she brought Desiree to Dr. Melanie Bravo and to the KCHC emergency room, when Desiree began having seizures. Ex. FF, at SVS 1078; Ex BB, M001795–96. While she took other action at the same time that was inconsistent with a desire to hide the identity of the child-including telephoning SVS immediately before and immediately after taking Desiree to KCHC, one inference, as she explained to SVS either on February 1st or 2nd, was that she provided the wrong name because "she was nervous about the baby's condition." Ex. 47, SVS 0739. Consequently, I will assume for purposes of the following analysis that a reasonable jury could conclude that Desiree was injured while she was under Maitland's care.

### DISCUSSION

 To establish their claims under 42 U.S.C. § 1983, plaintiffs must demonstrate a violation of a right protected by the Constitution or laws of the United States that was committed by a person acting under the color of state law. *Whalen v. Cnty. of Fulton,* 126 F.3d 400, 405 (2d Cir.1997). The Second Circuit has held—in the words of the Supreme Court—that a "State may be held liable under the Due Process Clause for failing to protect children in foster homes from mistreatment at the hands of their foster parents." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.,* 489 U.S. 189, 201 n. 9, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989) (citing *Doe v. N.Y.C. Dep't of Soc. Servs.,* 649 F.2d 134, 141–42 (2d Cir.1981), *cert. denied sub nom. Catholic Home Bureau v. Doe,* 464 U.S.

---

**5.** Numbered exhibits refer to exhibits filed by plaintiffs in support of their motion for summary judgment.

864, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983)). Indeed, the case of foster children is closely analogous to that of individuals involuntarily committed to a state institution for the mentally retarded, who have also been held to have substantive rights under the Fourteenth Amendment's Due Process Clause. *Youngberg v. Romeo,* 457 U.S. 307, 315, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982). These rights, the Supreme Court held, are violated by professional caretakers "only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.* at 323, 102 S.Ct. 2452. This standard "is essentially a gross negligence standard." *Doe v. N.Y.C. Dep't of Soc. Servs.,* 709 F.2d 782, 790 (2d Cir.1983) (*"Doe II"*). Such a standard, which is arguably more protective than the deliberate indifference applicable to an individual incarcerated for criminal activity, is based on the Supreme Court's judgment that "[p]ersons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg,* 457 U.S. at 321–22, 102 S.Ct. 2452. Clearly, an infant, such as Desiree, who is in the custody of the City, is likewise entitled to a standard that affords her greater protection than that afforded to an individual incarcerated for criminal activity.

A constitutional violation, however, is only the threshold showing in order to establish liability of a municipality or public entity. In addition to showing that a public employee violated a foster child's substantive due process rights through gross negligence, plaintiffs must also establish that the violation occurred under an official custom or policy. Thus, the City, the New York City Health and Hospitals Corporation, KCHC, and SVS may be held liable under § 1983 only for a violation of constitutional rights committed pursuant to an official policy or custom.

██ While the terms "policy" and "custom" are often used interchangeably, the two words reflect separate legal concepts. "The Supreme Court has identified at least two situations that constitute a municipal policy: (1) where there is an officially promulgated policy as that term is generally understood (i.e., a formal act by the municipality's governing body), and (2) where a single act is taken by a municipal employee who, as a matter of state law, has final policymaking authority in the area in which the action was taken." *Davis v. City of New York,* 228 F.Supp.2d 327, 336–37 (S.D.N.Y.2002) (citing *Monell v. Dep't of Soc. Servs. of New York,* 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), and *Pembaur v. City of Cincinnati,* 475 U.S. 469, 480–81, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986)), *aff'd* 75 Fed.Appx. 827 (2d Cir.2003); *see also Walker v. City of New York,* 974 F.2d 293 (1992). "[A]n act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law." *Bd. of Cnty. Comm'rs v. Brown,* 520 U.S. 397, 404, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). This is based on the premise that, where a custom and practice is so " 'well settled and widespread … the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice.' " *Davis,* 228 F.Supp.2d at 337 (quoting *Silva v. Worden,* 130 F.3d 26, 31 (1st Cir.1997)). "Widespread means that acts [complained of] are common or prevalent throughout the agency; well-settled means that the acts [complained of] have

achieved permanent, or close to permanent, status." *Id.* at 346. Moreover, even where a policy or practice is established, a plaintiff must establish "a direct causal link between [the] municipal policy or custom and the alleged constitutional deprivation." *City of Canton v. Harris,* 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).

I proceed to discuss the application of these principals to the potential liability of SVS. In the course of so doing, I also address the liability of each of its individual employees who are named as defendants.

## A. Saint Vincent's Services

### 1. St. Vincent's Services' Liability Under § 1983

Because SVS is a private entity, the threshold issue is whether a cause of action against it lies under § 1983. Relying on *Perez v. Sugarman,* 499 F.2d 761 (2d Cir.1974), and *Duchesne v. Sugarman,* 566 F.2d 817 (2d Cir.1977), plaintiffs assert that SVS, "as a foster care agency, ... operate[s] under color of state law." Pls.' Opp'n Br. 24–25. While these two cases support plaintiffs' argument, the Supreme Court has so dramatically changed the legal landscape in this area that these cases are arguably no longer good law.

Professor Martin Schwartz has observed perceptively that, in analyzing the state action jurisprudence, "it is important to consider the era in which the decision was rendered." 1A MARTIN A. SCHWARTZ, SECTION 1983 LITIGATION: CLAIMS AND DEFENSES § 5.12, at 5–85 (4th ed.2003). He explains that, the Warren Court took an expansive view of state action in its effort to combat racial discrimination in society. *Id.; see also* Burt Neuborne, *The Gravitational Pull of Race on the Warren Court,* 2010 Sup.Ct. Rev. 59, 73–74 (2010). The subsequent Burger and Rehnquist Courts reversed this trend, however, in favor of shielding private behavior from the reach of the Constitution. SCHWARTZ, *supra,* at 5–85 to 5–86. This reversal occurred through a series of decisions that applied precedents in a "narrow, stringent fashion" to find no state action despite heavy government involvement in private conduct. *Id.* at 5–86. These decisions sent the unmistakable message that the concept of state action is to be given only limited berth, and that federal courts must assess the continued vitality of earlier state-action precedents in light of more recent decisional law. *Id.*

Professor Schwartz explains that four principles have emerged as the Supreme Court has narrowed the scope of its state-action jurisprudence:

1. Mere state regulation of private conduct, even if extensive, is insufficient to support a finding of state action.

2. State authorization of private conduct does not make the private party a state actor; to find state action, the state must participate in, order, coerce, or significantly encourage the contested activity.

3. State assistance to a private party, even if substantial, will not support a finding of state action, whether that assistance is in the form of direct financial aid, tax exemptions, monopoly power, government mortgage insurance, or the grant of a license.

4. The mere importance of the function carried out by the private sector is an insufficient basis upon which to find state action; for state action to be found, the function must be historically, traditionally, and exclusively governmental.

*Id.* at 5–87 to 5–88. The Supreme Court has found no state action even in cases where all four of these government involvements existed. *Id.* at 5–88. Thus,

even an entity that is "extensively regulated, obtained governmental approval, received substantial governmental assistance, and performed an important societal function" has been held to not engage in state action. *Id.* at 5–88 (citing *S.F. Arts & Athletics, Inc. v. U.S. Olympic Comm.,* 483 U.S. 522, 107 S.Ct. 2971, 97 L.Ed.2d 427 (1987)); *Rendell–Baker v. Kohn,* 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982); *Blum v. Yaretsky,* 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982); *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974). Against this backdrop, I turn to *Perez* and *Duchesne,* and *Sybalski v. Independent Group Home Living Program, Inc.,* 546 F.3d 255 (2d Cir.2008), the recent Second Circuit decision that reflects the accuracy of Professor Schwartz's analysis.

*Perez* primarily relied on the public function test to determine that "the acts of the private institutions," in detaining appellant's children, and refusing to return them to her custody, "were 'under color of' state law." *Perez,* 499 F.2d at 764. The Second Circuit explained that, "[i]n certain instances[,] the actions of private entities may be considered to be infused with 'state action' if those private parties are performing a function public or governmental in nature and which would have to be performed by the Government but for the activities of the private parties." *Id.* at 765. Under the New York State statutory scheme, as the Court elaborated, (1) state officials are "responsible for the welfare of children who are in need of public assistance and care, support and protection," and (2) the State may fulfill this responsibility by providing "direct assistance" or by "utiliz[ing] private entities." *Id.* Where it chooses to use a private institution, the State, "in effect ... provid[es] the care through the private institution[]." *Id.*

*Perez* also noted that it did not have to rely "solely on the public function theory ... to support, [the] conclusion that 'state action' exists." *Id.* Specifically, it observed that the "comprehensive statutory regulatory scheme of the New York Social Services Law is persuasive, perhaps compelling, evidence of the degree to which the State has insinuated itself into the actions of the private defendants here." *Id.* This "insinuation" derived from the fact that New York State law "makes the state bear the responsibility for the care of all children in need of assistance." *Id.* (citing N.Y. Soc. Servs. Law § 395). Moreover, *Perez* observed that the State's "dependence ... on private parties is a factor which tends to establish the intimacy requisite to finding of 'state action.'" *Id.* at 766 (citing *Burton v. Wilmington Parking Auth.,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961)).

In *Duchesne,* the Second Circuit was asked to reconsider its holding on the state action question in light of *Jackson v. Metropolitan Edison Company.* In *Jackson,* the Supreme Court held that supplying of utility service is not state action because it "is not traditionally the exclusive prerogative of the State." *Jackson,* 419 U.S. at 353, 95 S.Ct. 449. The Second Circuit, without any further elaboration, stated: "We have considered the implications of [*Jackson*], but reaffirm our earlier finding of state action." *Duchesne,* 566 F.2d at 822 n. 4.

The Supreme Court's state action jurisprudence since *Perez* and *Duchesne* has increasingly "emphasize[d] the 'exclusivity' aspect of the [public function] test." *Mark v. Borough of Hatboro,* 51 F.3d 1137, 1142 (3d Cir.1995). Thus, in *Blum v. Yaretsky,* the Court held that the private "nursing homes' decisions to discharge or transfer Medicaid patients to lower levels of care" was not state action, in part because nurs-

ing homes do not "perform a function that has been 'traditionally the *exclusive* prerogative of the State.'" 457 U.S. at 1011–12, 102 S.Ct. 2777 (quoting *Jackson*, 419 U.S. at 353, 95 S.Ct. 449) (emphasis added). Similarly, in *Rendell–Baker v. Kohn*, while acknowledging that a private school's "education of maladjusted high school students is a public function," the Supreme Court also emphasized that point "is only the beginning of the inquiry." 457 U.S. at 842, 102 S.Ct. 2764. And, it stressed that its "holdings have made clear that the relevant question is not simply whether a private group is serving a 'public function'. . . . [T]he question is whether the function performed has been 'traditionally the exclusive prerogative of the State.'" *Id.* (citing *Jackson*, 419 U.S. at 353, 95 S.Ct. 449; *Blum*, 457 U.S. at 1011, 102 S.Ct. 2777) (emphasis in original). Because the function of providing education for students who could not be served by traditional public schools was not traditionally undertaken by the State of Massachusetts, the publicly funded private school providing such special education was not a state actor. *Id.*

Similarly, caring for abandoned children is a function that has traditionally been performed by private parties in New York. One history of New York's social welfare legislation explains that, in the 1880s, New York began to regulate the private "societies for the care of children," which were required to apply for a license and keep certain records concerning the children for whom they cared. Nathaniel Fensterstock, *History of New York Social Welfare Legislation, Introduction* to N.Y. Soc. Welfare Law (McKinney Vol. 52A 1941) (available in microfiche). In 1898, "The Placing Out Law" was passed, which "conferred upon the State Board of Charities jurisdiction over dependent children placed out by charitable societies or by individuals in family homes." *Id.* at XXXVII & n. 107

(describing inspection and oversight prerogative of the State Board of Charities over child-placement organizations). "By the end of the nineteenth century, the pattern of child care in the State had become so well defined that it was known as the 'New York System.' The 'System' primarily consisted of placing dependent and neglected children who were public charges under the care of private agencies, with the responsible counties, cities and towns paying for the services provided." *Wilder v. Sugarman*, 385 F.Supp. 1013, 1020 (S.D.N.Y.1974) (citing David M. Schneider & Albert Deutsch, *The History of Public Welfare in New York State 1867–1940*, at 160 (1941)).

The statutory provision, which *Perez* and *Duchesne* rely on to support their holding that private foster placement agencies may qualify as state actors, provides:

A public welfare district shall be responsible for the welfare of children who are in need of public assistance and care, support and protection, residing or found in its territory, insofar as not inconsistent with the jurisdiction of a family court. Such assistance and care shall be administered either directly by the public welfare official charged therewith, or by another public welfare official acting on his behalf by and pursuant to the provisions of this chapter, or through an authorized agency as defined by this chapter.

N.Y. Soc. Serv. Law § 395 (McKinney 2003). This statute, adopted in 1929, does not establish that foster placement services were "traditionally" performed by the state, nor does it establish that foster placement services were then or are now *exclusively reserved* to the state, as is now required of a public function under the Supreme Court's current jurisprudence. *See, e.g., Jackson*, 419 U.S. at 352, 95 S.Ct.

449. Indeed, the Family Court observed in a 1966 decision that private agencies remained the principal providers of foster placement services in New York City. *See In re Bonez*, 50 Misc.2d 1080, 272 N.Y.S.2d 587, 592 (N.Y.Fam.Ct.1966) ("The City Public Welfare District has continued to allocate children to private agencies for foster home care and for adoptive care ... and has continued to use public funds to maintain these children in shelter care or other forms of care that did not meet their needs."). The Second Circuit likewise observed that,

> [i]n pursuance of a long tradition, [New York City] has elected to rely heavily on private agencies [to provide foster care services to abused or neglected children.] ... Most of [these private agencies] are religiously affiliated. These agencies place the child either with a foster family or in an institution run by the agency, depending on the child's needs.

*Wilder v. Bernstein*, 848 F.2d 1338, 1341 (2d Cir.1988); *see also* Martin Guggenheim, *State–Supported Foster Care: The Interplay Between the Prohibition of Establishing Religion and the Free Exercise Rights of Parents and Children: Wilder v. Bernstein*, 56 Brook. L. Rev. 603, 605 (1990) ("New York has, since colonial times, depended on religious affiliated institutions and agencies to care for state wards."). Finally, the Appellate Division

recently held that "the function of caring for children in need of foster care" may be deemed a "governmental function" for purposes of applying the New York governmental immunity defense, *not because it has historically been provided by the state*, but because this function "is deemed best executed by government and is undertaken [by the government] without thought of profit or revenue." *Kochanski v. City of New York*, 76 A.D.3d 1050, 908 N.Y.S.2d 260, 262–63 (2010).[6] These authorities provide persuasive support, under the Supreme Court's current jurisprudence, for the conclusion that foster care agencies do not perform a function that has been "traditionally *exclusively* reserved to the State." *Jackson*, 419 U.S. at 352, 95 S.Ct. 449 (emphasis added).

*Sybalski v. Independent Group Home Living Program, Inc.*, 546 F.3d 255 (2d Cir.2008) (per curiam), provides additional compelling support. The plaintiffs in *Sybalski* were the parents of a resident at a group home for mentally disabled adults. *Id.* at 256. They alleged that, in response to their numerous complaints "about the care, protection and services received by their son at the group home," defendants had "issued letters seeking to punish and intimidate plaintiffs and impose illegal and unlawful restrictions on plaintiffs['] right to visit and communicate with their son." *Id.* at 256–57 (alteration in original) (internal quotation marks omitted). Although a

---

**6.** The traditionally-private nature of foster placement services is not specific to New York. The First, Third, and Fourth Circuits have similarly observed that "child care and placement is not traditionally the exclusive prerogative of the state." *Malachowski v. City of Keene*, 787 F.2d 704, 711 (1st Cir. 1986) (per curiam); *Leshko v. Servis*, 423 F.3d 337, 343 (3d Cir.2005) ("No aspect of providing care to foster children in Pennsylvania has ever been the exclusive province of the government."); *Milburn v. Anne Arundel Cnty. Dep't of Soc. Servs.*, 871 F.2d 474, 479

(4th Cir.) ("The care of foster children is not traditionally the exclusive prerogative of the State."), *cert. denied*, 493 U.S. 850, 110 S.Ct. 148, 107 L.Ed.2d 106 (1989). Scholars have also observed that, "[u]niquely, foster care had originally been provided by private agencies with public agencies later joining as partners. It was always a 'privatized' system, never an exclusively public one." Susan Vivian Mangold, *Protection, Privatization, and Profit in the Foster Care System*, 60 Ohio St. L.J. 1295, 1298 (1999).

private corporation owned the group home, plaintiffs argued that it qualified as a state actor under the joint action and public function tests because

"[t]he State, by statute and regulation, has assumed a duty to provide custody, care and habilitative services to its mentally retarded citizens," and "[w]here the State chooses to delegate those responsibilities and a private entity assumes them, as here, neither the State nor the private entity may assert that the entity's acts and omissions do not occur under color of state law." In essence, [the plaintiffs] argue that the state has undertaken to care for its mentally disabled citizens by (1) acting jointly with defendants to provide care for the mentally disabled and (2) delegating the public function of caring for the mentally disabled to defendants.

*Id.* at 258 (first and second alterations in original) (citations omitted) (quoting plaintiffs' appellate brief).

The Second Circuit rejected this argument, which mirrors the argument made by the plaintiffs in this case, because "care for the mentally disabled was neither traditionally nor *exclusively* reserved to the state." *Id.* at 259 (emphasis added). Looking at the history of the treatment of the mentally ill in New York provided in *Okunieff v. Rosenberg,* 996 F.Supp. 343, 356 (S.D.N.Y.1998), it found that caring for the mentally ill and mentally disabled had not traditionally been under the exclusive authority of the state. *Sybalski,* 546 F.3d at 259–60. The Court thus clearly held that "private actors must be delegated functions that were traditionally under the *exclusive* authority of the state for the public function test to be satisfied." *Id.* (emphasis added). Indeed, the "earliest movement toward complete state care did not come until the second half of the nineteenth century." *Id.* (quoting *Okunieff,*

996 F.Supp. at 356). Consequently, the Second Circuit concluded that "defendants' actions cannot be attributed to the state under the public function test." *Id.* at 260.

In the present case, even though they were given the opportunity, *see* Sept. 24, 2011 Order, plaintiffs have not presented any evidence that caring for abandoned children by placing them in foster homes was traditionally under the exclusive authority of the state. On the contrary, the evidence discussed earlier demonstrates that it was not until the end of the nineteenth century that New York enacted "The Placing Out Law," which "conferred upon the State Board of Charities jurisdiction over dependent children placed out by charitable societies or by individuals in family homes." Fensterstock, *supra,* at XXXVII & n. 107. Neither *Perez* nor *Duchesne* expressly considered, much less held, that caring for abandoned children was a power "traditionally *exclusively* reserved to the State." *Jackson,* 419 U.S. at 352, 95 S.Ct. 449 (emphasis added).

Nor can plaintiffs demonstrate the existence of state action in this case under any other available theory. In *Sybalski,* the Second Circuit recognized that pursuant to the New York Mental Hygiene Law, "facilities licensed by the state to provide care and treatment to the mentally disabled are subject to regulation, licensing, and oversight by the commissioner of mental health and the commissioner of mental retardation and developmental disabilities." 546 F.3d at 258. It nevertheless held that this extensive regulation, which included "substantive rights for patients in mental health facilities and procedures for protecting these rights, ... [did] not amount to 'significant encouragement,' 'willful particip[ation],' or state 'entwin[ing]' in defendants' decision to restrict the Sybalskis' access to their son." *Id.* (third and fourth alterations in original) (citation omitted);

*see also Jackson,* 419 U.S. at 350, 95 S.Ct. 449 ("The mere fact that a business is subject to state regulation does not by itself convert its action into that of the State.... Nor does the fact that the regulation is extensive and detailed ... do so."). Moreover, the Supreme Court has said that "[a]ction taken by private entities with the mere approval or acquiescence of the State is not state action." *Am. Mfrs. Mut. Ins. Co. v. Sullivan,* 526 U.S. 40, 52, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999).

*Sybalski* relied on *Blum v. Yaretsky,* which rejected the argument that the extensive funding and regulation of nursing homes, which included a requirement that a physician complete a form justifying the decision to discharge a patient, made the state responsible for that decision. 546 F.3d at 258–59. The state's requirement that the form be completed was not determinative because "the physicians, and not the forms, make the decision about whether the patient's care is medically necessary." *Id.* at 259. Consistent with *Blum, Sybalski* held that, "[w]hile the State of New York has established *procedures* governing the limitations that mental health facilities place on the ability of patients to receive visitors, the administrators of those facilities make the *decision* about whether such limitations should be imposed." *Id.* (emphasis in original).

In this case as well, plaintiffs have not identified any evidence that the acts of the City defendants involved "significant encouragement," "willful particip[ation]," or state "entwin[ing]" in SVS's decision to place Desiree with Maitland, to pursue or not to pursue any specific course of medical treatment while at KCHC, or to return Desiree to Maitland's care after Desiree's first and second hospitalizations. While the City chose SVS as the foster care agency to oversee Desiree's placement, it was SVS who chose Maitland as the foster

parent. Indeed, plaintiffs complain about the lack of City involvement in the selection of Maitland, and they allege that the City chose SVS simply based on the City's " 'next available bed' policy." Pls.' Opp'n Br. 4; Ex. LL, at 0955. As explained by Diana Cortez, an ACS employee, when a child goes into foster care with one of the contract agencies, it is the foster care agency that selects the foster home. Ex. 66, Cortez Dep. 35:14–18. More specifically, "[w]hen a child is ready to come into placement, ... [ACS allocations] have to check the ... computer system to see which bed is available ..., so that the contacted agency whose name pops up that has the available bed, that's the home that is selected basically." *Id.* at 36:4–12.

■ Moreover, *Sybalski* also makes clear that the proposition that private child-caring institutions may be state actors by virtue of their contractual relationship with the State is likewise no longer a valid basis for finding state action. The fact that the state may contract with a private party to perform a function does not transform the private party into a state actor unless the function is traditionally exclusively a state function. *Cooper v. U.S. Postal Serv.,* 577 F.3d 479, 492 (2d Cir.2009). Although the state and private entities might, by virtue of a contractual relationship, be engaged jointly in the general mission of caring for abandoned children, only the *joint acts* of the private entity and the state are subject to challenge as state action. *See Sybalski,* 546 F.3d at 258. As Professor Schwartz observes, "[s]tate authorization of private conduct does not make the private party a state actor; to find state action, the state must participate in, order, coerce, or significantly encourage the contested activity." SCHWARTZ, *supra,* at 5–87; *see, e.g., Blum,* 457 U.S. at 1004, 102 S.Ct. 2777 ("[O]ur precedents indicate that a State

normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State."). There is no evidence in the record showing that the City participated in, coerced, or significantly encouraged any of SVS's challenged acts. Moreover, "[t]here is no indication or evidence that the [City] encouraged or permits the [physical] abuse of foster children or that [it] encourages or permits foster care providers to ignore, fail to investigate, or fail to report incidents of child abuse." *Lynn ex rel. Julie B. v. St. Anne Inst.*, No. 03–1333, 2006 WL 516796, at *17 (N.D.N.Y. Mar. 2, 2006).

Nevertheless, assuming—as I am obligated to do until the Second Circuit holds otherwise—that SVS is a state actor, I next address whether the conduct of SVS's employees constituted a constitutional violation of Desiree's rights and, if so, whether SVS can be held responsible for the conduct of its employees. These two issues are analytically separate. *See City of Canton v. Harris*, 489 U.S. 378, 388 n. 8, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) ("[T]he proper standard for determining when a municipality will be liable under § 1983 for constitutional wrongs does not turn on any underlying culpability test that determines when such wrongs have occurred."); *Bd. of the Cnty. Comm'rs v. Brown*, 520 U.S. 397, 407, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) ("[Q]uite apart from the state of mind required to establish the underlying constitutional violation ... a plaintiff seeking to establish municipal liability on the theory that a facially lawful municipal action has led an employee to violate a plaintiff's rights must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences. A showing of simple or even heightened negligence will not suffice." (citation omitted)). This "is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Brown*, 520 U.S. at 410, 117 S.Ct. 1382. More recently, in the context of a failure to train case, the Supreme Court reiterated that

[a] pattern of similar constitutional violations by untrained employees is "ordinarily necessary" to demonstrate deliberate indifference for purposes of failure to train. [*Brown*], 520 U.S. at 409, 117 S.Ct. 1382.... Policymakers' "continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the 'deliberate indifference'—necessary to trigger municipal liability." *Id.*, at 407, 117 S.Ct. 1382.... Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights.

*Connick v. Thompson*, —— U.S. ——, 131 S.Ct. 1350, 1360, 179 L.Ed.2d 417 (2011). Plaintiffs rely on failure to supervise and failure to train in order to establish liability against SVS under § 1983.

### 2. Failure to supervise

The "deliberate indifference standard [which] governs municipal liability claims based upon inadequate training logically extends to municipal liability claims based upon inadequate supervision, and many decisions so hold." Schwartz, *supra*, § 7.18[B][1], at 7–204; *Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir.2007) ("Although *City of Canton* addressed a claim of a failure to train, the stringent causation and culpability requirements set out in that case have been applied to a broad

range of supervisory liability claims."). Moreover, although SVS is not a municipal corporation, the standard for determining whether SVS can be held responsible for the conduct of its employees under § 1983 is the same as the standard for determining when a municipality can be held responsible for the actions of its employees. *See Green v. City of New York*, 465 F.3d 65, 82 (2d Cir.2006); SCHWARTZ, *supra*, § 6.04, at 6–41 n. 159.

Perhaps the leading Second Circuit case discussing the theory of failure to supervise as a basis for imposing liability is *Amnesty America v. Town of West Hartford*, 361 F.3d 113 (2d Cir.2004), which involved the police's use of excessive force against arrestees at two anti-abortion demonstrations. The plaintiffs proffered evidence "that the necessity for more supervision was glaringly obvious at both demonstrations and that [the Chief of Police] ignored the alleged constitutional violations [then] in progress." *Id.* at 127–28. In holding that the evidence, if credited by a jury, could establish a claim for failure to supervise, then-Judge Sotomayor set out the following standard for a claim based on failure to supervise: "[P]laintiffs' evidence must establish only that a policy-making official had notice of a potentially serious problem of unconstitutional conduct, such that the need for corrective action or supervision was 'obvious,' and the policymaker's failure to investigate or rectify the situation evidences deliberate indifference, rather than mere negligence or bureaucratic inaction." *Id.* at 128 (citation omitted); *see also Connick*, 131 S.Ct. at 1360.

■ The placement of Desiree with Maitland fails to satisfy this standard. Indeed, Judge Sand, in a case similar to this one, rejected a § 1983 cause of action against a private foster care agency for failure to supervise. *Park v. City of New York*, No. 99 Civ. 2981, 2003 WL 133232 (S.D.N.Y. Jan. 16, 2003). In so doing, he held that a substantive due process claim did not lie where a foster parent "was a trained and licensed foster care provider, was not listed in the Central Register, and had no criminal record," and where there were "no complaints or other evidence of inappropriate guardianship" until almost three weeks after the children left foster care. *Id.* at *15; *see also Richards v. City of New York*, 433 F.Supp.2d 404, 426–27 (S.D.N.Y.2006) ("[S]upervisors do not possess the requisite mental state of deliberate indifference when the children are placed with a trained and licensed foster care provider, who was not listed in the Central Register, and had no criminal record." (internal quotation marks and alterations omitted)). Here, Maitland was a trained and licensed foster care provider and pediatric nurse, who had no criminal record and was not listed in the Central Register. SVS Defs.' Rule 56.1 Stmt. ¶¶ 97–99. Moreover, she had been a foster parent for approximately one year, and during that period, she had cared for up to three foster children simultaneously, without any incidents of abuse.

Plaintiffs argue that, because Maitland had "such a demanding work schedule" and already had two other foster children under school age, "[a] reasonable jury could find that SVS's failure to determine who would actually be caring for the children—who, in reality, would be the foster mother—showed deliberate indifference to [the] safety of the children placed in their care." Pls.' Opp'n Br. 44–45. The record in this case provides a basis for a jury to conclude that the SVS home study and review of the backup supervision plans might have been deficient in that (1) there is no clear evidence that any SVS employee ever spoke to Guillaume prior to Desiree's placement with Maitland, (2) there is

no indication that SVS asked about the scheduling and logistics of Maitland's backup childcare plan, and (3) an SCR report on Guillaume was not ordered until after Desiree had been removed from Maitland's home.[7]

Nevertheless, even if this constituted gross negligence on the part of SVS's employees sufficient to establish a violation of the Constitution, plaintiffs have not adduced evidence that SVS's *policies and procedures* for vetting a foster parent's childcare arrangements were deliberately indifferent to the foster children's constitutional rights. Nor have they adduced evidence that any supervisory official at SVS was aware of the deficiency in vetting the placement in this particular case. Indeed, Dr. Blake, plaintiffs' expert, acknowledged that SVS's policy and procedure clearly stated that a foster parent's babysitter must be thoroughly studied before a foster child placement is approved. *See* Ex. 53, at 6; Pls.' Opp'n Br. 44 n. 11 (acknowledging SVS's policy). Plaintiffs argue, however, that no paperwork is present in SVS's file on Maitland to indicate that such an interview was conducted with Guillaume. Pls.' Opp'n Br. 44 n. 11. While, in this case, this policy may not have been followed by an SVS employee, both the Supreme Court and the Second Circuit have made it clear that, without more, a city would not automatically be liable under § 1983 if one of its employees applied an otherwise appropriate policy in an unconstitutional manner. *City of Canton,* 489 U.S. at 387, 109 S.Ct. 1197; *see also Fiacco v. City of Rensselaer,* 783 F.2d 319, 326–27 (2d Cir.1986). The imposition of liability in those circumstances could only rest on respondeat superior, a basis for liability that is not available under § 1983. *See City of Canton,* 489 U.S. at 387, 109 S.Ct. 1197.

Nor have plaintiffs alleged, much less offered evidence, that either Torres–Zobler or Macadaeg ranked among SVS's "top supervisory personnel," a showing that would also justify the imposition of liability under § 1983. Specifically, there is no evidence that either of these two had any responsibility for approving Maitland as a foster parent. *See* Pls.' Rule 56.1 Stmt. ¶¶ 13–14 (Torres–Zobler was assigned "as the caseworker to supervise the delivery of foster care services to Desiree," whereas Macadaeg was assigned "to supervise [Torres–Zobler] in the delivery of foster care services to Desiree."). Thus, even if plaintiffs could prove that Torres–Zobler did not meet or interview Desiree's babysitter, they still would not have established that SVS was deliberately indifferent to Maitland's fitness as a foster parent. Indeed, even if, as plaintiffs argue, "SVS caseworkers either knew or deliberately failed to learn that Ms. Maitland was the foster mother in name only, and that she had delegated nearly all of the care of her

---

7. Plaintiffs' description of one SVS document, upon which they rely in this context, is misleading. Plaintiffs state that "Gail Williams, a nurse at SVS, was concerned for Ms. Maitland because 'she spends a lot of time at the hospital with this baby, has other children, and works.'" Pls.' Opp'n Br. 46 (citing Ex. 46, at SVS 1054). From this statement (and a few others), plaintiffs argue that "a reasonable jury could conclude that placing Desiree in Ms. Maitland's home showed a deliberate indifference to her safety and health." *Id.* The statement from Williams, which appears to reflect concern with the care of Maitland's two other foster children, was dated February 27, 1996—following Desiree's third admission to KCHC, after which she never returned to Maitland's home. This was also two months after Desiree was placed in Maitland's home and ten months after Maitland's home study was approved by SVS. *See* Ex. EE, SVS at 3860. Accordingly, Williams's comment could not possibly have had any bearing upon either Maitland's certification or SVS's placement of Desiree with Maitland.

foster children to others," Pls.' Br. Opp'n 45, this would not suffice to impose § 1983 liability upon SVS because caseworkers are not top supervisory personnel.

The only member of SVS's top supervisory staff that plaintiffs allege was deliberately indifferent to Desiree's medical treatment is Sister Elizabeth Mullane, the director of the Positive Caring Services ("PCS"). *See Id.* at 46. But plaintiffs themselves state that "Sister Mullane visited Desiree in the hospital during her first hospitalization," and that she "directed her staff nurses to visit Desiree in the hospital during Desiree's first hospitalization." Pls.' Rule 56.1 Stmt. ¶¶ 132–33. Mullane also spoke in person with KCHC staff regarding Desiree's condition. Ex. 77, Mullane Dep. 75:19–25. Nevertheless, plaintiffs argue that "Sister Mullane knew that Desiree needed HIV testing in the beginning of February 1996" and that she was deliberately indifferent in that she failed to demand that Desiree receive HIV testing immediately. Pls.' Rule 56.1 Stmt. ¶ 131. The single page of Sister Mullane's deposition transcript that plaintiffs cite as evidence in support of this statement seems to indicate (though without any context, it is difficult to be certain) that (1) in early February 1996, Sister Mullane first became aware of Desiree and her need for HIV testing (though no one has explained *how* she became aware of Desiree or her need for HIV testing), and (2) at that time Sister Mullane was the director of SVS's PCS unit. *See* Ex. 77, Mullane Dep. 55:6–25. But as plaintiffs themselves acknowledge, Desiree was tested for HIV on February 7, 1996. Pls.' Rule 56.1 Stmt. ¶ 47. So, the suggestion that Sister Mullane was deliberately indifferent to Desiree's need for HIV testing, when Desiree was in fact tested either shortly after or at the same time that Mullane learned of her case, is a nonstarter. Moreover, it bears repeating

that it was ultimately determined that Desiree was not HIV positive.

Plaintiffs also argue that, "[a]lthough defendant Mullane and the SVS medical staff knew about the CT-scan, they never followed up, allowing the frightening health problems to continue unchecked and undiagnosed." *See* Pls.' Opp'n Br. 46–47. I pass over the testimony of Gail Williams, the SVS nurse whom the plaintiffs cite for this proposition, that she had called and followed up with the KCHC doctors as to the next steps they would take. Ex. 80, Williams Dep. 30:18–20. The next question to Williams in her deposition was "What did you find out?" *Id.* at 30:24. But her answer remains a mystery because the remainder of her deposition was not included in plaintiffs' exhibit 80. Nevertheless, as discussed above, during Desiree's first hospitalization, the various physicians at KCHC did not consider Desiree's health problems to be urgent once Desiree stabilized. Ex. 79, Schubert Dep. 22:25–23:22. An MRI was ordered, and it was anticipated to occur in early April 1996. *Id.* at 25:17–19. And Desiree was kept in the hospital from February 2nd to February 16th to monitor her condition. Plaintiffs have not produced any evidence that a single doctor or nurse who treated Desiree communicated to anyone, much less to Mullane or top supervisory staff at SVS, that (1) Desiree's symptoms were suspicious, (2) that Desiree's condition was indicative of abuse, or (3) that Desiree required any tests or treatment different from what she received at KCHC or was scheduled to receive. Indeed, plaintiffs' own expert testified that child abuse was not considered a possible cause of Desiree's symptoms during her first hospitalization. Ex. M, Ajl Dep. 316:11–17.

Perhaps more significantly, social services administrators do not exhibit deliberate indifference to the health, safety, and

welfare of foster children by relying on the course of medical treatment prescribed by medical professionals. To the contrary, seeking out and relying upon the judgment of medical professionals has been deemed by the Second Circuit to be objectively reasonable. *See V.S. v. Muhammad,* 595 F.3d 426, 431 (2d Cir.2010); *Cornejo v. Bell,* 592 F.3d 121, 129 (2d Cir.2010); *Gulett v. Haines,* 229 F.Supp.2d 806, 817 (S.D.Ohio 2002). Accordingly, plaintiffs' argument that top SVS supervisory personnel failed to supervise Desiree's medical condition, because they relied upon and did not second-guess or somehow overrule the diagnosis offered, and course of treatment prescribed, by medical professionals, must fail.

Plaintiffs also allege that SVS should have suspected abuse when Maitland provided Dr. Melanie Bravo and KCHC a false name for Desiree on the evening of February 1st. Plaintiffs assert that Maitland "gave a false name to Dr. Bravo because she wanted to conceal Desiree's identity." Pls.' Rule 56.1 Stmt. ¶ 98. Moreover, plaintiffs assert that "[g]iving a hospital emergency room [a] false name for a child raises suspicions that the child has been abused." *Id.* ¶ 104. This argument is significantly undermined by the fact that Maitland called SVS twice on the very same day, February 1, 1996—once to report Desiree's condition, *see* SVS Defs.' Rule 56.1 Stmt. ¶ 170, and again to report that she was taking Desiree to KCHC, *see id.* ¶ 173. Indeed, the next day, on February 2, 1996, Torres–Zobler sent a letter to KCHC stating: "The foster mother Ms. Janice Maitland, gave the wrong name at admission because she was nervous about the baby's condition. The name the foster mother gave is baby girl Arbun. Please make a correction. Again the last name is Abson." Ex. 47, at SVS 0739. Perhaps someone should have inquired why exactly Maitland was nervous about the baby's

condition, although apparently this is not an uncommon reaction by foster parents to such circumstances. *See* City Defs.' Reply Br., Ex. Jackson Dep. 182:3–15. But the inference that Torres–Zobler should have had a strong suspicion that Desiree had been abused, when Maitland had personally called SVS twice the very same night to report Desiree's condition, is insufficient to support a claim of gross negligence or deliberate indifference. Moreover, even if Torres–Zobler's conduct could be so characterized, it would not provide a basis for holding SVS liable under § 1983 because she is not a supervisor and there is no direct causal link between her conduct and any policy or custom followed by SVS.

### 3. *Failure to train*

Plaintiffs do not develop their failure to train theory against SVS in any way in their opposition brief. Moreover, they have admitted that SVS provided training to foster parents with whom children with special needs would be placed. For example, plaintiffs acknowledge that "[t]he PCS unit provided individualized medical supervision as well as specially screened and trained foster parents," who would care for special needs foster children. Pls.' Rule 56.1 Stmt. ¶ 34. Plaintiffs also do not contest SVS's statement that "SVS case workers received training in all areas of foster parent training, placement and identification of abuse." SVS Defs.' Rule 56.1 Stmt. ¶ 69; Pls.' Response to SVS Defs.' Rule 56.1 Stmt. ¶ 69. In particular, as quoted above, plaintiffs do not contest that Desiree's SVS case worker "was trained on identifying signs of child abuse." SVS Defs.' Rule 56.1 Stmt. ¶ 75; Pls.' Response to SVS Defs.' Rule 56.1 Stmt. ¶ 75.

█ Plaintiffs'. theory appears, rather, to be that "SVS did not give Ms. Maitland any special training on how to care for children who were born HIV positive."

Pls.' Rule 56.1 Stmt. ¶ 43. They fail to suggest what this training would have been or how it would have prevented the injury Desiree suffered. Moreover, this theory fails as well because no one knew prior to Desiree's placement with Maitland that Desiree was born HIV positive (and plaintiffs have represented that Desiree *was not in fact HIV positive, see* Pls.' Opp'n Br. 12). In sum, the most that can be said is that SVS had a policy of providing training but that Maitland did not receive it from one of its employees. Such an isolated departure from agency policy by an employee of SVS does not provide a basis for liability under § 1983. *See City of Canton,* 489 U.S. at 387, 109 S.Ct. 1197.

### 4. The Individual SVS Caseworkers: Torres–Zobler, Macadaeg, and Mullane

■ Plaintiffs have also failed to produce sufficient evidence to show that the individual SVS defendants Torres–Zobler, Macadaeg, and Mullane were grossly negligent with respect to Desiree's safety and medical care. The evidence concerning the conduct of Mullane has already been discussed; there is nothing to indicate that Mullane acted or failed to act in disregard of a risk of serious harm to Desiree's safety or health. Nor have Plaintiffs produced sufficient evidence to support an inference that Macadaeg was grossly negligent; their opposition brief fails to mention a single specific act she performed or failed to perform. In support of the argument that Torres–Zobler was grossly negligent with regard to Desiree's safety and health, plaintiffs point to the fact that she "did not meet or interview Desiree's babysitter." Pls.' Rule 56.1 Stmt. ¶ 78. Nevertheless, plaintiffs do not provide any evidence that it was within Torres–Zobler's scope of responsibility to conduct inquiries into Maitland's babysitting arrangements.

Plaintiffs also argue generally that SVS caseworkers did not visit the foster home frequently enough or have sufficient communications with Maitland and the hospital staff during and between hospitalizations. *See, e.g., id.* at ¶¶ 139–40, 180; Pls.' Opp'n Br. 46–47. This argument is inconsistent with the record evidence. Again, plaintiffs themselves state that the director of SVS's Positive Caring Services unit "Sister Mullane visited Desiree in the hospital during her first hospitalization," and "directed her staff nurses to visit Desiree in the hospital during Desiree's first hospitalization." Pls.' Rule 56.1 Stmt. ¶¶ 132–33. Although Desiree had not yet been assigned to the Positive Caring Services unit, Mullane also spoke in person with KCHC staff regarding Desiree's condition. Ex. 77, Mullane Dep. 75:19–25; Ex. 46, SVS at 0147. Moreover, Torres–Zobler (1) met with Maitland and Desiree on January 4th at SVS's offices for Desiree's initial medical intake; (2) met with Maitland and Desiree at SVS on January 29, 1996, SVS Defs.' Rule 56.1 Stmt. ¶ 161, (3) visited Maitland's home on January 30, *id.* ¶ 162, and found that "everything at the home was in compliance with SVS regulations," *id.* ¶ 164, (4) spoke to Maitland about the first hospitalization, Ex. U, Torres–Zobler Dep. 106:17–108:16, (5) contacted the hospital twice on February 2nd, SVS Defs.' Rule 56.1 Stmt. ¶¶ 180, 182, (6) visited the hospital on February 13th, Ex. U, Torres–Zobler Dep. 116:19–119:2, (7) spoke to Maitland when Desiree was discharged on February 16th, *id.* at 158:11–17, (8) spoke to Maitland again when Desiree was readmitted on February 18th, *id.* at 172:7–12, and (9) spoke to both Maitland and a doctor about the third hospitalization, *id.* at 187:21–189:18. Accordingly, Torres–Zobler, Macadaeg, and Mullane are each entitled to summary judgment with respect to plaintiffs' causes of action arising under § 1983.

## CONCLUSION

The motion of SVS for summary judgment on plaintiffs' claims under 42 U.S.C. § 1983 is granted. I likewise grant the motions of the individual defendants employed by SVS for summary judgment.

**SO ORDERED.**